**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 6, 2009

Charles R. Fulbruge III
Clerk

No. 07-70009

MIGUEL A. PAREDES,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, WIENER, and OWEN, Circuit Judges.

PER CURIAM:

Miguel Paredes, convicted of capital murder and sentenced to death, appeals the denial of his federal petition for writ of habeas corpus. Specifically, he

claims his trial counsel rendered ineffective assistance by failing to object to certain testimony on Confrontation Clause grounds. He also seeks a certificate of appealability ("COA") to present six other claims: that (1) the state violated his right under the Sixth and Fourteenth Amendments to have a fair cross-section of the community on panels from which grand jurors are chosen; (2) his trial counsel rendered ineffective assistance by failing to object to the state's purportedly untimely request for a "jury shuffle"; (3) counsel was ineffective by failing to object to jury instructions that did not ensure juror unanimity; (4) counsel was ineffective by failing to object on grounds that Texas's Special Issue Number 3 violates the Sixth Amendment by not requiring the state to prove a lack of mitigating circumstances beyond a reasonable doubt; (5) the trial court violated his federal constitutional rights by not requiring the jury to agree unanimously on precisely which of the victims Paredes could be held responsible for killing; and (6) an instruction used in his sentencing violated the Eighth and Fourteenth Amendments by including vague words and by failing properly to channel the jury's discretion.

In regard to the issues as to which COA was previously granted, we affirm the denial of habeas relief. We affirm in part and deny in part the application for a COA.

I.

In 2000, Paredes, John Saenz, and Greg Alvarado—all members of the Hermanos Pistoleros Latinos ("HPL") gang—fatally shot rival gang members Adrian Torres, Nelly Bravo, and Shawn Cain inside Saenz's house. Paredes and several HPL members then disposed of the bodies and removed other physical

evidence. Paredes was indicted on three counts of capital murder.

Several witnesses testified for the prosecution. John Saenz's brother, Eric Saenz, provided testimony concerning phone calls with John and a face-to-face conversation with John in Paredes's presence, both of which incriminated Paredes. First, Eric testified that on the morning of the killings, John Saenz telephoned and asked him to come over with a gun, because John was expecting trouble from Torres. John also indicated he would seek help from Paredes. Eric said he would try to come over but never appeared. Later in the day, John called again, saying Paredes and Alvarado had arrived with weapons.

John called a third time that day, saying they had "taken care of the problem" with Torres; communicated that John, Paredes, and Alvarado were at the house; and asked Eric to recruit HPL members to remove the bodies. Given the context and the request to remove bodies, Eric understood John's statement that they had "taken care of the problem" to mean that they had killed Torres, Bravo, and Cain.

Eric also testified regarding a face-to-face conversation with his brother later that night. Around midnight, Paredes, John, and John's acquaintance, Tomas Ayala, drove to Eric's house. In Paredes's presence, John gave Eric a detailed account of the day's events, including that Paredes, John, and Alvarado had taken part in the killings and that Paredes had shot Bravo and Cain. Paredes did not dispute John's details of the murders and cleanup and said that Eric "should have been there" and that he "would have had some fun."

Ayala testified for the prosecution, mirroring Eric Saenz's description of the conversation that took place at Eric's house. Ayala testified that John related the details of the murders to Eric—including that Paredes had shot Cain and

3

Bravo. According to Ayala, Paredes never interrupted to dispute the story.

The prosecution also offered testimony from Paul Alden, a neighbor of John Saenz's, who testified that he saw the victims arrive at the Saenz house and heard a barrage of gunshots a few minutes after the victims entered. Shortly thereafter, John Saenz exited the house without a shirt. He looked nervous, took note of several neighbors nearby, went back inside, then came outside and briefly conversed with a neighbor. Alden did not see any of the victims exit the house but did see several vehicles arrive at the house, one vehicle back into the garage, and a three-vehicle caravan leave the premises. In the days after the gunfire, he saw people cleaning the house, hosing down the bed of a pickup truck, and laying new tile.

At the conclusion of the guilt-innocence phase, the court instructed the jury that it could find Paredes guilty of capital murder as a shooter, a party, or a conspirator. During the punishment phase, the prosecution introduced evidence of other crimes Paredes had committed, including another murder; a shooting in which two people were wounded; a kidnaping; an instance in which Paredes burned and disposed of the body of someone who had overdosed on drugs; an arrest for driving while intoxicated, without a license, while unlawfully carrying a firearm; and numerous lesser offenses. Under Texas's Special Issue 1, the jury determined there was a probability that Paredes "would commit criminal acts of violence that would constitute a continuing threat to society." On the second special issue, the jury found beyond a reasonable doubt that Paredes (a) caused the death of one of the victims or (b) intended to kill a victim or anticipated that a human life would be taken. Regarding Special Issue 3, the jury found a lack of mitigating circumstances to justify a sentence of life impris-

onment rather than death.

Based on these findings, the court sentenced Paredes to death. Paredes appealed his conviction and sentence, and the Texas Court of Criminal Appeals ("TCCA") affirmed. Paredes did not petition for writ of certiorari.

Paredes filed a habeas application in state court, which held an evidentiary hearing, issued an opinion detailing its findings of fact and conclusions of law, and recommended that the TCCA deny the application. The TCCA adopted the findings of fact and conclusions of law and denied habeas relief.

After exhausting state remedies, Paredes filed the instant federal habeas petition and requested an evidentiary hearing. The district court denied all habeas relief and the request for a hearing. It granted a COA on one issue: whether trial counsel rendered ineffective assistance by failing to raise Confrontation Clause objections to those portions of Eric Saenz's and Ayala's testimony in which they recounted their face-to-face conversation with John Saenz about the details of the killings. Paredes appeals the denial on that issue and requests a COA on six additional grounds.

## II.

Paredes argues that his trial counsel rendered ineffective assistance by failing to raise Confrontation Clause objections to Eric Saenz's and Ayala's testimony. Both testified to a conversation in which John Saenz recounted the killings and stated that Paredes was one of the shooters. Ayala testified that as John Saenz told his story, Paredes never interrupted to dispute his role in the murders or otherwise to contest the account being given. According to Eric, when John completed the story, Paredes spoke up to say that Eric "should have

been there, [because he] would have had some fun."

Paredes's attorney objected to those statements on hearsay grounds but did not claim they violated the Confrontation Clause. Paredes was thus barred from pursuing the Confrontation Clause argument on appeal, and he assails his counsel's performance in failing to raise the objection at trial.[1]

To prevail on his habeas claim, Paredes must show that his state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Our inquiry, therefore, is whether the TCCA rendered a decision contrary to, or unreasonably applied, the Supreme Court's Sixth Amendment jurisprudence in deciding that counsel's performance comported with the Sixth Amendment.[2] The opinion in *Strickland v. Washington*, 466 U.S. 668 (1984), sets forth the "clearly established federal law" for Paredes's ineffective-assistance claims: Paredes must show that counsel was deficient *and* that the deficient performance prejudiced him by calling the verdict into question. *Id.* at 687 (emphasis added).

The Supreme Court's Confrontation Clause jurisprudence changed significantly during the pendency of Paredes's direct appeal when the Court handed down *Crawford v. Washington*, 541 U.S. 36 (2004), on March 8, 2004.[3] Paredes's trial was in October 2001, and his direct appeals concluded on January 14, 2004.

---

[1] In his brief raising the Confrontation Clause issue, Paredes also urges that his counsel was deficient in failing to interview Ayala before trial. The district court did not grant a COA on that claim, so we do not address it.

[2] *See Schaetzle v. Cockrell*, 343 F.3d 440, 443-44 (5th Cir. 2003).

[3] The Court held that testimonial statements cannot be introduced in court without the opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 68-69.

*Paredes v. State*, 129 S.W.3d 530 (Tex. Crim. App. 2004).

A conviction is "final" only when the defendant has exhausted his state appeals *and* either (1) the time for requesting certiorari has passed or (2) the Supreme Court has affirmatively denied such a petition. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). Paredes did not petition for certiorari, so his conviction became final on April 13, 2004, when his time for petitioning for certiorari expired.[4] Although *Crawford* was announced before Paredes's sentence became final, we determine whether performance was deficient by making "every effort . . . to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Washington*, 466 U.S. at 689. Thus, counsel's performance is judged by the law that existed at the time of trial and not by reference to law that was then unavailable.[5]

We therefore would look to *Ohio v. Roberts*, 448 U.S. 56 (1980), the governing Confrontation Clause standard at the time of Paredes's trial, to determine whether the attorney's failure to raise a Confrontation Clause objection was deficient. Under *Roberts*, hearsay statements do not offend the Constitution if the evidence comes within a firmly rooted exception to the hearsay rule or contains particularized guarantees of trustworthiness. *Id.* at 66.

We need not, in this case, undertake a protracted historical inquiry to de-

---

[4] *See* 28 U.S.C. § 2101(d) ("The time for appeal or application for a writ of certiorari to review the judgment of a State court in a criminal case shall be as prescribed by rules of the Supreme Court."); SUP. CT. R. 13.1 (stating that a petition is timely if filed within ninety days after entry of judgment).

[5] *See Ogan v. Cockrell*, 297 F.3d 349, 360 (5th Cir. 2002) ("The determination whether the performance of counsel was deficient is based upon the law as it existed at the time of trial." (quoting *Lucas v. Johnson*, 132 F.3d 1069, 1078 (5th Cir. 1998)); *Westley v. Johnson*, 83 F.3d 714, 722-23 (5th Cir. 1996) (same).

termine whether the exception was "firmly rooted," however. Assuming for the sake of argument, without holding so, that the testimony was inadmissible and Paredes's counsel was deficient in failing to object to it, Parades is still not entitled to relief. *Washington* calls for us to examine whether any potential deficiency in failing to object on Confrontation Clause grounds might have prejudiced Paredes. In addition to Eric Saenz's and Ayala's testimony, the state presented overwhelming evidence that Paredes committed capital murder. The evidence was strong under two different legal theories: that Paredes (1) was one of the shooters and (2) was criminally responsible for the killings under Texas's law of parties.

First, the state presented cumulative evidence that Paredes was one of the shooters. Julio Gonzalez testified that he helped John Saenz and Paredes dispose of the bodies and destroy other physical evidence of the crimes. He said that while Paredes was cleaning the house, he admitted to shooting Bravo and Cain.

This direct evidence was supported by overwhelming circumstantial evidence. The jury heard testimony that John Saenz was expecting trouble from Adrian Torres, so he asked an HPL member to come to his house and bring a weapon. When that member declined, John stated he would call Paredes. Furthermore, the jury heard testimony that Paredes was at the house with a gun before the killings, that no one left through the front door during the killings, and that Paredes remained at the house immediately after the killings. This combined direct and circumstantial evidence strongly supports the verdict.

Second, the state presented a large amount of evidence showing that Paredes was guilty under the law of parties. The court instructed the jury that it

could find Paredes guilty if, "acting with the intent to promote or assist the commission of the offense, he solicit[ed], encourage[d], direct[ed], aid[ed], or attempt-[ed] to aid [another] person to commit the offense." The jury was also instructed it could find Paredes guilty if the killings came about as the result of a conspiracy to commit a felony, the offense was committed in furtherance of the unlawful purpose, the offense should have been anticipated, and Paredes was a conspirator.

The evidence reviewed above showed that in response to John Saenz's call asking for help with Torres, Paredes brought a gun to John's house and remained there during the killings. Paredes assisted the killers by helping to dispose of the bodies and clean the house. At a minium, these facts show Paredes encouraged and aided the shooters.

Therefore, even without Saenz's and Ayala's testimony of the face-to-face conversation outside Saenz's house, the evidence against Paredes was overwhelming. Even if trial counsel was deficient in failing to raise a Confrontation Clause objection, that deficient performance did not prejudice Paredes.[6]

III.

In addition to raising Confrontation Clause issues, Paredes asks this court to grant a COA on six issues the district court rejected. We may issue a COA only if Paredes makes "a substantial showing of the denial of a constitutional

---

[6] For the reasons supporting our conclusion that the failure to object on Confrontation Clause grounds could not have prejudiced Paredes for purposes of *Washington*, we separately reject Paredes's contention as harmless error. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that "habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice'").

right." 28 U.S.C. § 2253(c)(2). This standard requires Paredes to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In determining whether to issue a COA, we do not engage in full analysis of the factual and legal bases of Paredes's claims, *Neville v. Dretke*, 423 F.3d 474, 482 (5th Cir. 2005), but instead "conduct an overview of the issues presented and a general assessment of their merits," *Ortiz v. Quarterman*, 504 F.3d 492, 500 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 2428 (2008).

## A.

Paredes says the state violated his right under the Sixth Amendment, applicable to the states under the Fourteenth Amendment, to have a fair cross section of the community on panels from which grand jurors are chosen.[7] According to Paredes, Hispanics are "disproportionate[ly] and consistent[ly] exclu[ded] . . . from the pool of eligible persons to serve on a grand jury in Bexar County." We decline to extend a COA on this issue, because Paredes has defaulted the argument and the claim fails on its merits even if he had not defaulted.

## 1.

The argument is unavailable because of procedural default. "The general rule is that the federal habeas court will not consider a claim that the last state court rejected on the basis of an adequate and independent state procedural ground." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004). Where a state court

---

[7] We do not read Paredes's brief as bringing a separate claim under the Equal Protection Clause of the Fourteenth Amendment.

asserts a procedural bar, we presume that obstacle is "adequate and independent," but the petitioner can overcome that presumption by showing that state courts do not strictly or regularly follow the rule. *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995). There are exceptions where the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law" or if the default would work "a fundamental miscarriage of justice." *Id.* at 418 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

The state habeas court explicitly stated that Paredes had raised his Sixth Amendment claim for the first time in his state habeas proceedings. It concluded that because Paredes failed to raise the objection in advance of his collateral attack, he waived the complaint.[8] Paredes makes no attempt to overcome the presumption that this procedural bar is an adequate and independent state ground, nor does he offer cause to explain his failure to raise the argument earlier. He has therefore defaulted this claim.

2.

Even if Paredes's argument were not procedurally barred, it would fail on its merits. To establish a *prima facie* fair-cross-section case, Paredes must make three showings. First, he must demonstrate "that the group alleged to be excluded is a 'distinctive' group in the community." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Second, he must establish "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Id.* He must finally demon-

---

[8] *Ex parte Paredes*, No. 2000-CR-6067B-W1, at 2 (399th Dist. Ct., Bexar County, Tex., Apr. 11, 2005) ("By failing to lodge any objection to the composition of the grand jury until this collateral attack on the conviction, the applicant has waived this complaint.").

strate "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* The parties stipulate to the first prong.

As for the second prong, Paredes fails to show that Hispanics are under-represented on prospective grand jury lists. The fair-cross-section requirement does not guarantee "jur[ies] of any particular composition." *Taylor*, 419 U.S. at 538. Rather, it only guarantees that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups."[9] Under both the commissioner system and the wheel system—the two grand-jury-selection processes Paredes claims were in place in Bexar County during the relevant time—the court selects grand jury panels from larger lists of prospective grand jurors.[10] Nevertheless, Paredes fails to present any data on the ratio of Hispanics to non-Hispanics on the lists from which grand jurors were chosen; he provides only evidence pertaining to the composition of actual grand jury panels.[11] This data is irrelevant to the Sixth Amendment inquiry.

Moreover, even if this data were relevant, we would decline to rely on it. Paredes's grand jury data consists of a table in his brief purporting to show the

---

[9] *Taylor*, 419 U.S. at 538; *cf. Holland v. Illinois*, 493 U.S. 474, 482-83 (1990) (stating that the Supreme Court has "never invoked the fair-cross-section principle . . . to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large") (internal quotation marks omitted).

[10] *See* TEX. CODE. CRIM. PROC. arts. 19.06, 19.22, 19.23, 19.25, 19.26 (explaining that under the commissioner system, the initial list contains between 15 and 40 people, and the court narrows the list to not more than 12 qualified grand jurors); *id.* art. 19.01(b) (specifying that under the "wheel" system, the initial list contains between 20 and 125 prospective grand jurors, and the court narrows the list to create the final grand jury panel).

[11] *See* Brief in Support of Application for Certificate of Appealability, at 10 ("Counsel has been unable to locate or obtain any records which reveal the list of the prospective grand jurors from which these twelve grand jurors were selected since that court no longer has those records.").

number of people with Hispanic names on Bexar County grand juries between 1990 and 2000. The source of this data does not appear in the record. Paredes provides no external citation for the data but instead claims it is "compiled from the Bexar County grand jury records." He also fails to explain his system for distinguishing Hispanic from non-Hispanic surnames. Thus, in addition to being irrelevant to Paredes's Sixth Amendment claim, the data is unreliable.

Paredes's claim fails under the third prong of the cross-section analysis as well. Paredes does not show that an underrepresentation is the result of a "systematic exclusion" of Hispanics from the selection of grand juries. Instead, he presents a string of bare assertions and conclusions that (1) the "large discrepancy of Hispanics on grand juries . . . indicates that the cause of the underrepresentation was systematic;" (2) the particular system used in his case somehow "adds to the source of the systematic exclusion"; and (3) "Hispanics were therefore systematically undrerepresented."

Paredes provides no explanation or support for any of these conclusions. For example, he repeats his position that a large discrepancy exists but does not explain how that second-prong statement alone satisfies the requirements of the third prong, which requires an independent showing that the discrepancy is systematic. If any discrepancy sufficient to satisfy the second prong would also satisfy the third, the third inquiry would be superfluous. Nor does Paredes allege any specific deficiency in the particular system under which he was indicted. His bare conclusions are insufficient to satisfy the third prong.

Paredes has not made a substantial showing of a denial of a constitutional right. Jurists of reason would not debate the resolution of this issue or conclude the issues Paredes presents warrant encouragement to proceed. We decline to

13

issue a COA on Paredes's fair-cross-section claim.

B.

Paredes requests a COA on three ineffective-assistance-of-counsel claims. Under *Washington*, 466 U.S. at 687, he must show that his trial counsel's performance was deficient and that the inadequate performance prejudiced him by calling the result of his trial into question.

1.

Paredes suggests that trial counsel rendered ineffective assistance by failing to object to the state's purportedly untimely jury shuffle request. We decline to issue a COA on this claim on two independent grounds: (1) We may not second-guess the state habeas court's conclusion that the prosecution's request was timely as a matter of state law, and (2) Paredes has not shown harm from the failure to object.

First, the Supreme Court has "repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Here, the state courts concluded, as a matter of state law, that the prosecution's jury-shuffle request was timely. Accepting this conclusion, as we must, we find that Paredes meets neither prong of *Washington*. His counsel did not act deficiently by failing to raise a meritless objection.[12] Moreover, the failure to make a meritless objection could not have

---

[12] *See Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) ("[F]ailure to assert a meritless objection cannot be grounds for a finding of deficient performance.").

14

prejudiced Paredes.[13]

Second, even if the state courts had found the request untimely, we would decline to issue a COA, because counsel's performance did not prejudice Paredes. An error that is harmless as a matter of Texas law is insufficient to satisfy the prejudice prong of *Washington*.[14] The purpose of a jury shuffle is "to ensure the compilation of a random list of jurors." *Ford v. State*, 73 S.W.3d 923, 926 (Tex. Crim. App. 2002). As long as the panel is still random after the shuffle, the error that occurs when the court orders an untimely shuffle is harmless under Texas law. *See Roberts v. State*, 139 S.W.3d 1, 2 (Tex. App.—Tyler 2003, pet. ref'd). The record contains no evidence that the final list was other than random. There is no prejudice; we decline to issue a COA on the jury-shuffle claim.

2.

Paredes claims his trial counsel was ineffective by failing to object to instructions that allowed the jury to convict him for the murder of Torres and Bravo, or Torres and Cain, or Bravo and Cain. Paredes avers that counsel should have objected on due process grounds, because the instructions did not ensure the jury was unanimous as to precisely whom Paredes murdered. For example, he claims some jurors could have concluded Paredes caused the death of Torres and Bravo, but the remaining jurors might have believed he killed Torres and Cain.

---

[13] *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

[14] *See Briseno v. Cockrell*, 274 F.3d 204, 210-12 (5th Cir. 2001); *Turner v. Johnson*, 106 F.3d 1178, 1188 & n.45 (5th Cir. 1997).

For reasons we explain below, we grant a COA on the substantive issue of whether the trial court violated Paredes's constitutional rights by not requiring the jury to agree unanimously on precisely which of the victims he could be held responsible for killing. Because the question whether counsel was constitutionally ineffective for failing to object to the instructions depends in part on whether the instructions were reversibly flawed, we grant a COA on this portion of Paredes's ineffective-assistance claim.

### 3.

Paredes contends he received ineffective assistance based on trial counsel's failure to object to Texas's Special Issue Number 3, which reads, State whether, taking into consideration all the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

> Answer: We, the jury, unanimously find and determine that the answer to this special issue is no.

> Or answer: We, the jury, because at least 10 jurors find that there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed answer this special issue yes.

Paredes argues this special issue violates the Sixth Amendment, as interpreted in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because it does not instruct that the state must prove a lack of mitigating circumstances beyond a reasonable doubt.

We have rejected this precise argument on previous occasions, holding that neither *Ring* nor *Apprendi* "require[s] the State to prove beyond a reasonable doubt the absence of mitigating circumstances."[15] An objection on this basis therefore would have been meritless; failing to object was not deficient and did not harm Paredes. We decline to issue a COA on this claim.

C.

Paredes argues that the trial court violated his federal constitutional rights by not requiring the jury to agree unanimously on precisely which of the victims Paredes could be held responsible for killing. Paredes was convicted under TEXAS PENAL CODE § 19.03(a)(7), which states that a person commits capital murder when "the person murders more than one person: (A) during the same criminal transaction; or (B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." The jurors were told they must reach a unanimous verdict.

Paredes points out that based on the way the jury was instructed, it may have convicted him without reaching unanimity about which two or more persons he murdered. That assertion is far from meritless. For example, suppose that four jurors thought he murdered Torres and Bravo, another four thought he murdered Torres and Cain, and the last four thought he murdered Bravo and Cain. Then, as to each respective victim, eight jurors thought Paredes murdered that victim and four jurors thought he did not. This leads to the arguably perverse result that Paredes could have been found not guilty of each of the three

---

[15] *Ortiz*, 504 F.3d at 504-05; *see also Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007).

murders had they been charged individually (none of which would have been a capital offense alone under the state statute), but guilty with the three charged together.

In resisting a COA, the state relies heavily on *Schad v. Arizona*, 501 U.S. 624 (1991), in which the Court considered an Arizona statute that defined first-degree murder as either premeditated murder or murder committed during the commission of another felony. The jury found the defendant guilty of first-degree murder but was not required to specify whether he committed premeditated murder or felony murder. *Id.* at 629. The Court held that a unanimity instruction was not constitutionally required. *Id.* at 645 (plurality opinion), 651-52 (Scalia, J., concurring).

The plurality and concurrence in *Schad* were careful to state the holding narrowly, mindful of the fluid conceptual boundary between calling two things different crimes and calling them different methods of committing the same crime. *Id.* at 632-33. For the plurality, this raised due process concerns. *Id.* at 632, 640. It is an area with no well-defined definitions, and the plurality noted "the impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution." *Id.* at 637.

Justice Scalia, specially concurring, explained the issue as follows:

> When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her. While that seems perfectly obvious, it is also true . . . that one can conceive of novel "umbrella" crimes (a felony consisting of either robbery or failure to file a tax return) where permitting a 6-to-6 verdict would seem contrary to due process.

18

*Id.* at 650 (Scalia, J., concurring). Justice Scalia reasoned that the issue there at hand––felony murder versus premeditated murder––was in the former category and did not require a unanimous "method" verdict. But like the plurality, he did not announce a precise rule for deciding which statutes are in which category.

Justice Scalia offered a counterexample that informs Paredes's case: "We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the 'moral equivalence' of those two acts." *Id.* at 651. That is obviously because assaulting X on Tuesday and assaulting Y on Wednesday are two separate crimes, each of which must be proved beyond a reasonable doubt to a unanimous jury.

Paredes's argument is that murdering Torres and Bravo, murdering Torres and Cain, and murdering Bravo and Cain are three separate crimes, not three separate "methods" of committing the murder of two or more people. We do not now decide that question, because in determining whether to issue a COA, as we have said, we do not necessarily engage in full analysis of Paredes's claims. *Neville v. Dretke*, 423 F.3d 478, 482 (5th Cir. 2005). We conclude, however, that as to only this claim and the ineffective-assistance claim associated with it, Paredes "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and has shown "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further," *Slack*, 529 U.S. at 483-84 (internal quotations and citations omitted). We grant a COA on this question.

D.

Paredes avers that an instruction used at sentencing violated the Eighth and Fourteenth Amendments by including vague words and failing properly to channel the jury's discretion. The instruction reads, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Miguel Paredes, would commit criminal acts of violence that would constitute a continuing threat to society?" According to Paredes, because the state does not define the terms "probability," "criminal acts of violence," and "continuing threat to society," juries must "guess at the meaning of these terms," and the terms therefore mean "anything a juror wants to believe."

This argument fails, because it is procedurally barred and has no merit. As we have explained, a habeas court may not consider a claim that state courts have rejected on a state procedural ground. Paredes's state habeas trial court determined that Paredes defaulted this claim by not asking the sentencing court to define the terms to which Paredes now objects. Paredes does not attempt to overcome either exception to this procedural-default rule.

On the merits of the issue, we have repeatedly upheld the constitutionality of Texas's capital sentencing regime[16] and have concluded that the terms in Texas's second special issue "have a plain meaning of sufficient content that the discretion left to the jury [is] no more than that inherent in the jury system itself."[17]

---

[16] *See, e.g.*, *Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999); *Woods v. Johnson*, 75 F.3d 1017 (5th Cir. 1996); *West v. Johnson*, 92 F.3d 1385 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116 (5th Cir. 1993); *Milton v. Procunier*, 744 F.2d 1091 (5th Cir. 1984).

[17] *Milton*, 744 F.2d at 1095-96; *see also Jurek v. Texas*, 428 U.S. 262, 274-76 (1976) (plurality opinion) (stating that the "task that a Texas jury must perform [in answering the second special issue is] basically no different from the task performed countless times each day
(continued...)

As for Paredes's claim that these punishment-phase terms unconstitutionally fail to limit the jury's discretion, precedent makes it plain that Texas performs the constitutionally required narrowing function *before* the punishment phase,[18] so Paredes's attack on the words used *during* punishment is unavailing. Because reasonable jurists would not disagree with our resolution of this issue, we decline to issue a COA.

In summary, in regard to the issues as to which COA was previously granted, the denial of habeas relief is AFFIRMED. The application for a COA is GRANTED in part and DENIED in part.

---

[17] (...continued)
throughout the American system of justice" and that the second special issue is not "so vague as to be meaningless"), *abrogated on other grounds by Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Jurek*, 428 U.S. at 279 (White, J., concurring) ("I agree with Justices Stewart, Powell, and Stevens that the issues posed in the [second special issue] have a common-sense core of meaning and that criminal juries should be capable of understanding them.").

[18] *See Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994) (explaining that a defendant is eligible for the death penalty only after the trier of fact convicts him of homicide and finds at least one aggravating circumstance, and noting that the trier may find such circumstance at the guilt phase rather than the punishment phase); *Jurek*, 428 U.S. at 270-71 (plurality opinion) (stating that Texas law delineates the set of murders qualifying for capital punishment by defining five classes of capital murder instead of defining a single class of murder and requiring the jury to find a separate aggravating factor at punishment).