# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 1, 2011

No. 10-70012

Lyle W. Cayce
Clerk

ROBERT LEE WOODARD

Petitioner - Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-2036

Before GARZA, CLEMENT, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Petitioner Robert Lee Woodard was convicted of murdering Achamma and Thankachen Mathai in Texas and sentenced to death. He now seeks a certificate of appealability ("COA") from the district court's denial of habeas corpus relief. Because Woodard has failed to make a substantial showing of a denial of a constitutional right or to otherwise meet the qualifications for his application, we deny his application for COA.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-70012

## FACTS AND PROCEEDINGS

After being convicted by jury of capital murder, Woodard was sentenced to death. The Texas Court of Criminal Appeals provided the following detailed description of the murders:

> The Mathais owned and operated a convenience store in Houston. On the night of February 12, 2000, Thankachen was working at the store, and Achamma had brought him dinner. Between 10 and 11 p.m., Cory Calloway bought gasoline from the store's pumps for his 1989 Lincoln. Leaving the engine running at the gas pumps, Calloway went to a pay telephone at the side of the building.
>
> While Calloway talked on the phone, Garvina Sadiki came in the store to buy merchandise. As Sadiki paid for her items, a man dressed in a hooded jacket entered the store with a gun in his hand. The man fired a shot and said, "This is a robbery. Don't anybody move."
>
> The robber ran behind the counter where Thankachen and Achamma stood, and ordered Thankachen to open the register. He ordered Sadiki not to look at him, and she obeyed. When Thankachen could not get the register open, the robber shot him. The man then ordered Achamma to open the register and threatened to shoot Thankachen again if she did not. Achamma cried and screamed, begging the man not to hurt them. As she fumbled with the register, the man pointed the gun toward Thankachen and fired another shot.
>
> Hearing police sirens, the robber cursed and ran from behind the counter to the front door only to discover that it had been locked. The man screamed for Achamma to open the door. Sadiki heard the lock open, and she saw the man push open the door. Then the robber returned to the counter where Achamma and Sadiki were standing. He backed up to Sadiki, keeping his face hidden, and demanded her keys. Sadiki handed the man her keys. The man said to Achamma, "Bitch," and he shot her in the head. He then ran out the front door. Outside the store, Calloway was still talking on the telephone. He heard the gunshots and then "a loud bust through the door." He looked up and saw a person wearing a hooded sweater run toward

2

No. 10-70012

his Lincoln. Calloway ran toward the man, who pointed a gun at him. Calloway retreated to safety, and the man drove away in Calloway's Lincoln. Calloway went in the store and called for help.

Police officers arrived quickly. Achamma was already dead. Thankachen died shortly after being taken to a hospital.

*Woodard v. State*, No. 74,080, 2005 WL 77143, at *1 (Tex. Crim. App. Oct. 20, 2004).

The Court of Criminal Appeals affirmed both Woodard's conviction and sentence on direct appeal, *id.*, and in state habeas corpus proceedings, *Ex parte Woodard*, No. WR-46, 501–02 (Tex. Crim. App. June 27, 2007). Woodard then timely filed an application for federal habeas corpus relief pursuant to 28 U.S.C. § 2254 and sought an evidentiary hearing. The district court granted Respondent's motion for summary judgment, denied Woodard's motion for an evidentiary hearing, and denied Woodard's petition in its entirety. The district court also declined to issue a COA. Woodard now seeks a COA from this court, raising three issues.

## STANDARD OF REVIEW

Woodard's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") and his application is therefore subject to the AEDPA. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quotations omitted). Under the AEDPA, a petitioner must obtain a COA as jurisdictional prerequisite before appealing a district court's denial of habeas relief. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Miller-El*, 537 U.S. at 336 (quotations omitted). A COA will

3

be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation omitted). "Any doubt regarding whether to  grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination." *ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007). The analysis "requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El*, 537 U.S. at 336. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id*. Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id*. at 338.

## DISCUSSION

### I.   Claim One: Pretrial Eyewitness Identification

Woodard contends that the procedures related to eyewitness Cory Calloway's identification of him were impermissibly suggestive and unreliable. The trial court received argument at a pretrial suppression hearing and concluded that the procedures were not impermissibly suggestive nor a violation of Woodard's rights. Alternatively, the trial court found that "in the event a higher court might find those procedures to be suggestive, that relying upon the factors enunciated in [*Neil v. Biggers,* 409 U.S. 188 (1972)] . . . the Court finds that there is no substantial likelihood of misidentification."

As described by the district court:

Mr. Calloway identified Woodard three times, two of which resulted in strongly positive identifications and the other resulted in an

affirmative, but tentative, identification. At some point Mr. Calloway viewed a photo array containing Woodard's picture, but he could not identify Woodard as the robber. On February 18, 2000, the police arranged a live lineup that included Woodard. Mr. Calloway "strongly agreed" that Woodard was the robber, but qualified that he wanted to see the suspects wearing a hood. The police could not at the time of the live lineup find similar clothing. On April 24, 2000, however, the police arranged for a photo array in which they had superimposed a hood over each picture. Mr. Calloway identified Woodard in an array that apparently contained the same photographs as the initial photo array. Finally, at trial Woodard donned a hooded jacket in the courtroom and Mr. Calloway positively identified him.

*Woodard v. Thaler*, 702 F. Supp. 2d 738, 760 (S.D. Tex. 2010) (footnote omitted).

"[A] conviction based on an eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990) (citing *Simmons v. United States*, 390 U.S. 377 (1968)). A two-step process governs the admissibility of identification evidence: First, a court must determine whether the pretrial identification was impermissibly suggestive. If it was, then second, a court must determine whether, "under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification." *Id.* This analysis is a mixed question of law and fact. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997). "[Woodard] cannot prevail in federal habeas unless he shows that the state court acted contrary to or unreasonably applied Supreme Court precedent in finding that the line-up was not impermissibly suggestive and that, even if it were, it did not taint [Calloway's] identification of [Woodard]." *Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006).

No. 10-70012

As to the first prong, Woodard argues that the pretrial identification procedures were impermissibly suggestive on three grounds: (1) Calloway was shown a photo spread containing a picture of Woodard prior to the live lineup, and Woodard was the only individual in both the photo spread and the lineup; (2) there was disparity among the individuals in the lineup and the individuals in the photo spread; and (3) the police had Calloway identify objects recovered from his stolen vehicle prior to identifying Woodard, implying that the police had apprehended the person who stole his vehicle. This district court found that the Texas "Court of Criminal Appeals considered the totality of the circumstances and found that the identification process was not unduly suggestive." *Woodard*, 702 F. Supp. 2d at 761–62. After reviewing the relevant Supreme Court case law, the district court concluded "[t]he differences in this case are minor when compared to those in which the Supreme Court has questioned the integrity of the lineup process." *Id.* We need not consider the merits of Woodard's arguments, however, because assuming, without deciding, that the pretrial identification procedures were impermissibly suggestive, Woodard has failed to demonstrate that "under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification." *Id.* (quotation omitted).

"The Supreme Court has identified several factors to help determine the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *Id. at* 544 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)).

No. 10-70012

Calloway, who was vigorously cross-examined[1] at both the motion to suppress hearing and again at trial, testified that he had a clear view of the robber's face from fifteen to twenty feet away for approximately twenty to thirty seconds. He saw Woodard twice: first when Woodard pointed a gun at him before taking his car, and then again when Woodard drove his car away, stating "[w]e both were looking at each other, eye contact, just, you know." The parking lot where Calloway first saw Woodard was well-lighted. As to the first time he saw Woodard, Calloway testified that his attention was focused on his car, which was left running at a gas pump, because of his concern that someone would steal it. Calloway's second observation came when he was chasing Woodard, "try[ing] to promote some attention to get, you know, people to notice [what] was going on." Calloway made an accurate, albeit general, description of the robber to the police at the scene. Although he only made a "strong tentative" identification of Woodard at the lineup, Calloway expressed no uncertainty during either his identification of Woodard in the modified photo array or at trial. The "strong tentative" identification of Woodard at the live lineup was made six days after the crime. *See Coleman*, 456 F.3d at 544 (allowing identification under this prong nine days after initial viewing of defendant). All five *Biggers* factors support a conclusion that there was no likelihood of misidentification in this case.

The district court concluded that "Woodard has not shown that the state courts were unreasonable in denying his federal constitutional challenge to the identification." *Woodard,* 702 F. Supp. 2d at 763. We agree that "Woodard has not shown that the circumstances [surrounding Calloway's eyewitness identification] irreparably led to a high probability of misidentification." *Id.* at

---

[1] Cross-examination "exposes to the jury the method's potential for error" and "substantially lessen[s]" the risk of misidentification. *Simmons*, 390 U.S. at 384.

No. 10-70012

762 n.22. Reasonable jurists could not debate the district court's determination. Accordingly, Woodard is not entitled to a COA on this issue.

## II.   Claim Two: Ineffective Assistance of Counsel for Failure to Use an Eyewitness Identification Expert

Woodard next asserts that his trial counsel were ineffective for failing to investigate the possibility of retaining and failing to employ an eyewitness identification expert at trial. To prove ineffective assistance of counsel, Woodard must show that both (1) his counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland's* first, or "performance," prong, "a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quotations omitted). Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  *Strickland's* second, or "prejudice," prong requires Woodard to show "a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of his capital murder trial would have been different." *Gray v. Epps*, 616 F.3d 436, 440 (5th Cir. 2010) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S at 669. "To evaluate whether counsel's alleged errors prejudiced the defense, [Woodard] must demonstrate that counsel's deficient performance renders the result of the trial 'unreliable or the proceeding fundamentally unfair.'" *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). "[E]ither prong of the *Strickland* inquiry may be evaluated first as both are necessary to make out a showing of ineffective assistance." *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007). "If [Woodard] fails to  show prejudice, the alleged deficiencies in his counsel's performance need not be

8

considered." *Id.* An error is prejudicial if it "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Paredes v. Thaler*, 617 F.3d 315, 319 (5th Cir. 2010) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Woodard claims that if his attorney had employed an expert to challenge Calloway's eyewitness identification, there is a reasonable probability that at least one juror would have struck a different balance. The court has addressed this argument before. In *Cantu v. Collins*, a habeas petitioner argued that his "trial counsel erred during the guilt-innocence phase of the trial by failing to secure the services of an expert witness to contest the testimony of [an] eyewitness." 967 F.2d 1006, 1016 (5th Cir. 1992). Although we recognized that the "petitioner is correct that the admission of expert testimony regarding eyewitness identifications is proper," we rejected his argument as "specious." *Id.* Woodard acknowledges *Cantu*, but seizes upon *Strickland's* instruction that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. at 688. He argues that "prevailing professional norms" have materially changed in the fifteen years between the petitioner in *Cantu's* trial and his own trial. In Woodard's view, these changes warrant a different result than in *Cantu*. We disagree.

As in *Cantu,* Woodard "cites no authority to support the theory that his trial counsel was *required* to call an expert witness to challenge [Calloway's] testimony." 967 F.2d at 1016 (emphasis in original). Moreover, the state habeas court found:

> based upon the credible affidavits of counsel Loper and Muldrow, that counsel discussed the possibility of employing an expert to testify about the reliability of eyewitness testimony; that counsel ultimately made the reasonable strategic decision not to use such an expert because it would not be the best use of defense resources because the combined effect of the testimony of Reginald Willis, Caspar Hines, and Kenneth Moore outweighed the benefit, if any, of using an eyewitness expert.

Furthermore, the court also found:

> based upon the appellate record and the credible affidavits of trial counsel, that trial counsel made a plausible, reasonable trial decision to attack identification through a pre-trial motion to suppress, vigorous cross-examination at trial, and jury argument.

The state habeas court concluded that "[t]rial counsel are not ineffective for making the reasonable, plausible trial decision to attempt to attack identification through testimony from an 'eyewitness expert.'" *See also Cantu*, 967 F.2d at 1016 ("Cantu's trial counsel testified at the evidentiary hearing that he considered seeking the services of an expert witness on the issue of eye-witness identification but decided against it based on his belief that his cross-examination of [the eyewitness] would be sufficient to refute the accuracy of the identification."). Woodard's counsel's "representation [did not fall] below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Woodard has not made a showing that this issue "is debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot,* 463 U.S. at 893 n.4. Accordingly, he is not entitled to a COA on this issue.

Woodard's claim also fails the second prong of the *Strickland* test. Woodard relies heavily upon *Ferensic v. Birkett*, 501 F.3d 469 (6th Cir. 2007). In that case, a Michigan jury convicted the petitioner of, *inter alia*, armed robbery. *Id.* at 470. "The *entirety of the evidence* against Ferensic was based upon eyewitness identifications made by the victimized couple." *Id.* (emphasis added) ("The district court emphasized that 'no physical evidence linked Petitioner to the crimes' and that, instead, the entirety of the state's case against him was based on multiple eyewitness identifications."). Defense counsel promised the jury that an eyewitness identification expert would testify on his client's behalf, but the Michigan trial court excluded the testimony of the expert due to a

violation of a discovery order.[2] *Id.* at 471. The trial court refused to instruct the jury that the expert was not permitted to testify. *Id.* at 478. The jurors "were unable to agree on a verdict at one point during their deliberations, [and] sent a note to the trial judge stating that 'we would like to see the police report,' and asked 'what are our options if we don't totally agree on a verdict?'" *Id.* at 483. The Sixth Circuit affirmed the district court's grant of habeas relief to Ferensic, holding that it was "in grave doubt as to whether the exclusion of [the robbery eyewitness] and especially [the expert] had a substantial and injurious effect or influence on the outcome of Ferensic's trial." *Id.* at 481. (quotations omitted).

In the first instance, *Ferensic* recognized that the scenario presented in this case, "the failure to retain an expert as an initial matter[,]presents a somewhat different problem than the [scenario presented in *Ferensic*,] exclusion of an already retained expert." *Ferensic,* 501 F.3d at 484. The Sixth Circuit acknowledged it had previously declined to find prejudice under *Strickland* in situations such as the one presented here. *See Dorch v. Smith*, 105 F. App'x 650, 653 (6th Cir. 2004) (upholding as reasonable the Michigan Court of Appeals's conclusion that defense counsel's failure to call an expert witness on eyewitness identification did not satisfy *Strickland* because counsel "presented several witnesses who testified as to [the habeas petitioner's] whereabouts on the weekend of the incident" and cross-examined the eyewitness regarding inconsistencies in his identification of the petitioner); *Tipton v. United States*, No. 96-5026, 1996 U.S. App. LEXIS 25466, at *1–2 (6th Cir. Sept. 26, 1996) (holding that "any allegedly ineffective assistance" caused by counsel's failure to

---

[2] The Michigan trial court also excluded the testimony of a witness to the robbery who would have provided testimony favorable to the defense. *Ferensic*, 501 F.3d at 471. At defense counsel's direction, the witness was due to arrive at the courthouse to testify at 11:00 am, but the other (and lone) defense witness finished testifying at 10:25 am. *Id.* at 479. The trial court denied Ferensic's motion for a brief adjournment and excluded the testimony. *Id.* at 480.

"hir[e] an expert in eyewitness identification" did not prejudice the petitioner within the meaning of *Strickland*).

Next, we have no such "grave doubt" as to whether the failure of Woodard's trial counsel to investigate and employ an eyewitness identification expert had a substantial and injurious effect on the jury's verdict. *See Paredes*, 617 F.3d at 319. Unlike in *Ferensic*, Calloway's identification of Woodard was not the "entirety of the evidence" against him. *See Ferensic*, 501 F.3d at 470. Indeed, although the jury did request to see several items, including the notes of the officer who took Calloway's statement at the scene and the composite sketch and photo exhibits of both Woodard and Reginald Willis, the evidence against Woodard was overwhelming. As noted by the district court:

> Circumstantial evidence and incriminatory testimony otherwise confirmed Woodard's guilt. A Crime Stoppers tip led to a police investigation which turned up evidence pointing to Woodard as the murderer. The police found Mr. Calloway's Lincoln at the apartment complex where Woodard's brother Reginald Willis lived. The police searched Mr. Willis' apartment and found items stolen from Mr. Calloway. The police linked Woodard to the robbery/murder through interviews with Woodard's friends and family members.
>
> For example, Mr. Willis' girlfriend Caspar Hines told the police that around the time of the murders Woodard showed up at their apartment wearing black gloves and knocking on the door loudly. Woodard carried items taken from Mr. Calloway's car into her apartment. Woodard tried to give her a gun that was "hot."
>
> Woodard's friend Dan Webster also saw him soon after the murders. Woodard had been driving a Lincoln like that stolen from Mr. Calloway and possessed items that had been in Mr. Calloway's car. Woodard told Mr. Webster that he had robbed a store and fired shots because a woman would not open the cash register. Woodard said that he thought that he had killed the woman. Woodard said that he stole the car immediately afterwards. Woodard also confessed that "he had messed up, and he hope God forgive him."

No. 10-70012

> Mr. Webster explained that Woodard carried many lottery tickets which he stole during the robbery. Woodard, Mr. Webster, and Mr. Willis scratched off the tickets. Mr. Webster later took several tickets to stores for redemption. Store clerks later identified Woodard as also having turned in some of the stolen lottery tickets.
>
> Woodard told his brother that he robbed the store, fired his gun, and stole Mr. Calloway's car. Mr. Willis saw Woodard with several stolen items. Mr. Willis told the police how Woodard had disposed of the murder weapon. A man performing cleanup for community service later found parts of a gun similar to that used in the murder in the same location where Woodard got rid of the weapon.

*Woodard*, 702 F. Supp. 2d at 744. Far from being the "entirety of the evidence against" Woodard, Calloway's identification was merely one piece of a comprehensive suite of evidence pointing to his guilt. Furthermore, Calloway did not identify Woodard as the shooter—he did not see the shooting. Calloway's testimony was offered as circumstantial evidence placing Woodard at the scene of the murder with the murder weapon. In his *own* affidavit[3] before the state habeas court, Woodard admits that he "decided to steal [Calloway's] vehicle" and that "[w]hen I got into the vehicle I discovered a gun under the seat and some lottery tickets." He also admits that he "destroyed the gun, took it apart."

The state court's decision was not unreasonable because Woodard cannot show prejudice under *Strickland*. Woodard has done nothing to lessen the impact of the other evidence against him. Despite any doubt about Calloway's eyewitness identification that the expert testimony might have potentially created, the comprehensive additional evidence presented by the prosecution prevents Woodard from being able to establish prejudice, even assuming *arguendo* that his counsel's performance was deficient. *See Conner*, 477 F.3d at

---

[3] Woodard's affidavit does not admit guilt to the murders.

13

294. Reasonable jurists could not debate this issue. For this alternative reason, Woodard is not entitled to a COA.

## III.   Claim Three: Ineffective Assistance of Counsel for Failure to Adequately Prepare Mental Health Expert

Woodard next asserts that his trial counsel were ineffective for failing to prepare the psychologist retained by the defense to testify in the punishment phase of Woodard's trial. He alleges that, because of this failure, Dr. Shirley Gruen, the aforementioned psychologist, testified in a manner that was detrimental to him. Specifically, Woodard contends that Gruen's testimony was harmful to him because 1) although she did not make a clinical diagnosis of Woodard, she volunteered on cross-examination that "[i]f you want the closest to what [diagnosis] I would make I would say something like borderline personality or systemic personality"; and 2) after being asked by the prosecutor if Woodard fit the DSM-IV criteria for "anti-social behavior disorder," she responded "[y]es, I agree with you." He asserts that his trial counsel failed to adequately prepare Gruen for cross-examination, rendering their assistance constitutionally defective. The question before us is whether the state habeas court was unreasonable in concluding that Woodard did not suffer from ineffective assistance of counsel.

The essence of Woodard's complaint is that his counsel did not give Dr. Gruen adequate time to examine him and, as a result, she was unprepared for the questions posed on cross-examination. Succinctly summarized by the district court, "Woodard does not claim that trial counsel should have presented a defense based on mental illness or defect. Woodard's claim is that, when hiring a mental-health expert to testify on future danger and recidivism, trial counsel should have anticipated that the State would portray him as a sociopath." *Woodard,* 702 F. Supp. 2d at 775. In support, Woodard relies upon affidavits submitted to the state habeas court by Dr. Gruen and Dr. Paula Lundberg-Love,

14

a psychologist who interviewed him in 2003. Both affidavits rely on the premise that Dr. Gruen was inadequately prepared to testify due to counsel's failure to provide adequate time to examine Woodard. Dr. Gruen averred that "if I had been notified in a timely manner regarding the need for my services in this matter, I would have been better prepared to testify in this case . . . by performing the necessary psychological tests. . . . These tests would have provided me with objective data, resulting in my testimony being more detailed, more specific, and *may have possibly* indicated different diagnostic conclusions." Dr. Lundberg-Love, who reviewed the same records as Dr. Gruen, opined that "it was highly likely that such time constraints may have compromised Dr. Gruen's opportunity to evaluate [Woodard] thoroughly," and stated that "had an expert such as myself been given a greater time frame, in which to interview Mr. Woodard and perform objective testing, . . . different diagnostic conclusions would have been formulated."

In affidavits before the state habeas court, Woodard's trial counsel explained that "[i]t was [counsel's] strategic decision to present the defendant as a person who was not deserving of death, but rather someone who had made bad decisions due to terrible circumstances earlier in life and someone who would do well in the structured environment of prison (rather than death)." Trial counsel's "purpose in retaining Dr. Gruen was to present someone who would do well in a structured environment, thereby reinforcing our argument for a life sentence rather than death." The state habeas court found that, in addition to Dr. Gruen's testimony, trial counsel "elicit[ed] testimony from eight additional punishment witnesses concerning [Woodard's] troubled childhood, his ability to do well in a structured environment and his good behavior in jail." Although the state habeas court acknowledged that portions of Dr. Gruen's testimony were detrimental, it found that trial counsel effectively rehabilitated Dr. Gruen and noted that the "bulk of Gruen's testimony" was consistent with trial counsel's strategy:

15

> [Woodard] fails to show that counsel are ineffective for retaining and presenting Shirley Gruen, psychologist, as a punishment witness, notwithstanding Gruen's testimony that the applicant was likely to re-offend, in light of trial counsel's rehabilitation of Gruen's statement and in light of the bulk of Gruen's testimony that the applicant did well in a structured environment; that the applicant would be incarcerated for at least forty years and be a viable part of incarcerated society; that the applicant would not affiliate himself with a prison gang; that [Woodard's] personality was not the same as psychopathic personality; and, that there were seven areas of mitigation applicable to [Woodard]: physiological deficit, physical and sexual abuse, life events, relationships, injury, emotional abuse, deficient communication and psychological disorder.

The state habeas court also concluded that "[c]ounsel are not ineffective for presenting the punishment testimony of Gruen in light of Gruen's assurances to counsel that she spent sufficient time with [Woodard] and was prepared to testify and in light of Gruen not informing counsel prior to trial of any opinion that [Woodard] was likely to reoffend."

> The state habeas court found that:

> [C]ounsel did not limit the amount of time that Gruen spent with [Woodard] to form her opinion; that counsel inquired whether she had sufficient time and Gruen assured counsel that she did and was prepared for testimony; that counsel discussed Gruen's testimony with her beforehand; that counsel believed that Gruen's testimony would support [the] defense strategy; and, that Gruen never told counsel that she did not have sufficient time to test [Woodard] and form an opinion.

We find that Woodard has not carried his burden under § 2254 to show that the state court reached an unreasonable conclusion as to trial counsel's alleged failure to adequately prepare Dr. Gruen. "To prove deficient performance under *Strickland*, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006) (quotations omitted). "We give substantial deference to counsel's performance, applying the strong presumption that counsel performed

adequately and exercised reasonable professional judgment. Because we must make every effort to eliminate the distorting effects of hindsight, a conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id.*

Woodard "fails to show how his counsel [are] responsible for the alleged inadequacies of and conflicts in his expert[']s testimony." *See Crawford v. Epps*, 353 F. App'x. 977, 990 (5th Cir. 2009). This is not a case where counsel did not provide the expert with sufficient information as to Woodard's background or explain their theory of defense to the expert. *Cf. Neal v. Puckett*, 239 F.3d 683, 690–91 (5th Cir. 2001) (finding ineffective assistance of counsel where, *inter alia*, the defense-retained psychologist's testimony "was surely limited by the fact that she had met with Neal just one time, three days before testifying, and that trial counsel failed to tell her about what specific crime Neal had been charged with or any facts about his personal history"). Nor is this a case where counsel failed to introduce mitigating evidence following a failure to investigate that was not based on reasonable professional judgment. *Cf. Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (focusing "on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*.") and *Williams v. Taylor*, 529 U.S. 362, 395–96 (2000) (finding ineffective assistance of counsel where attorney "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records").

Woodard's counsel made a reasonable strategic decision to argue that the defendant was "someone who had made bad decisions due to terrible circumstances and someone who would do well in the structured environment

of prison (rather than death)." Counsel retained Dr. Gruen to "present [Woodard] as someone who would do well in a structured environment." They discussed their strategy with Dr. Gruen who assured them that she had had sufficient time to examine Woodard and that she was prepared to testify. *See Blanton v. Quarterman*, 543 F.3d 230, 238 (5th Cir. 2008) ("As to deficient performance, we note that [the defendant] presented no evidence to suggest [the expert] was unqualified or that trial counsel had reason to question the results of the psychological examination she performed."). *Cf. Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) ("When experts request necessary information and are denied it, when testing requested by expert witnesses is not performed, and when experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel."). To the extent Dr. Gruen's testimony may have been detrimental to Woodard, that detriment cannot be impugned to his trial counsel. Woodard's counsel's "representation [did not fall] below an objective standard of reasonableness," and his claim therefore fails. *See Strickland*, 466 U.S. at 688. Reasonable jurists could not debate this issue and therefore Woodard is not entitled to a COA.

## CONCLUSION

For the foregoing reasons, Woodard's motion for a COA is DENIED in all respects.