Matias MORIN, III, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–96–212–CR.

Court of Appeals of Texas, Corpus Christi.

Oct. 9, 1997.

Larry Zinn, San Antonio, for Appellant.

Theodore C. Hake, Asst. Crim. Dist. Atty., Rene Guerra, Dist. & County Atty., Traci A. Sellman, Asst. Crim. Dist. Atty., Edinburg, for Appellee.

Before SEERDEN, C.J., and YANEZ and CHAVEZ, JJ.

## OPINION

YANEZ, Justice.

Matias Morin was convicted of murder and sentenced to sixty years in prison. He brings four points of error on appeal. Points one and two challenge the sufficiency of the evidence corroborating the testimony of an accomplice witness. Point three argues that the trial court erred in allowing evidence of extraneous crimes when the State failed to give adequate notice of its intent to use that evidence, and point four alleges error in the admission of a "backdoor" hearsay statement. We hold that the trial court committed reversible error in allowing the hearsay statement and reverse and remand for a new trial.

### Accomplice Testimony

The State's principal witness in this case was an accomplice in the crime, Javier Andres ("Andy") Cespedes. Cespedes testified that he and the appellant were "pretty good friends" who would see each other every day or every other day. According to Cespedes, appellant's brother, Marc Morin, gave some cocaine to the victim, Javier Cantu, for Cantu to sell. However, Cantu returned the cocaine and said that he had been unable to sell it. Appellant then took the cocaine to Houston and tried to sell it there. According to Cespedes's testimony, when appellant returned, he said that he had "almost been killed" because the cocaine was diluted, and that Cantu "had to go down" because he had diluted the cocaine. Marc Morin borrowed a nine millimeter handgun from Cespedes and showed him two twelve-gauge shotguns that he already had, and told Cespedes that the guns were "for" Cantu. All three guns were hidden at Cespedes's house and then they were wrapped in towels and carried to the Morins' van. Cespedes also accompanied appellant on a trip to buy ammunition for the guns. Cespedes and both Morins discussed how to commit the murder. They decided that first appellant would call Cantu and ask him for a ride. Appellant would then direct Cantu to drive him to a remote area near an irrigation canal, where Marc Morin and Cespedes would be waiting to shoot Cantu.

Cespedes testified that the murder was carried out as planned. Appellant phoned Cantu, and Cespedes and Marc Morin drove to the canal in a grey Chevrolet Astro van to wait for appellant and Cantu. They arrived at approximately 7:20 p.m. A short while later Cantu and appellant arrived. Cespedes then shot Cantu with both the shotgun and the nine millimeter handgun. Neither of the Morins fired a shot. Cespedes and the Morin brothers then drove away quickly in the van.

### Non-accomplice Evidence

Florentino Garza was the police investigator assigned to the case. He testified that he found nine millimeter casings at the murder scene, and that the victim appeared to have been shot with a shotgun. Several spent twelve gauge shotgun shells were also found by police at the murder scene. They were able to identify the victim as Javier Cantu from his wallet, and Garza then went to speak with Cantu's family. He learned from Cantu's mother that, just before leaving home at approximately 7:15 p.m., he had told

her he was going to see Mat Morin.[1] The next day Garza received information from Robert Putty that Putty had seen a grey Chevrolet Astro van near the murder scene at 7:45 p.m. Garza took Putty to see the Morins' van, and Putty identified it as the van he had seen the day before. However, Putty recalled seeing Texas licence plates on the van he saw at the murder scene, while the Morins' van had Massachusetts plates.

Garza also noticed orange paint on a dent on the bumper of the Morin van. This paint was compared to orange paint on a bent barrier pipe at the murder scene. The pipe was bent as if someone had backed into it or pushed it with something. Garza testified that the paints were compared in the "DPS lab" and that the results were "a perfect match." Garza did not elaborate on the nature of the testing conducted, nor did any other evidence indicate how the paints were compared. Inside the Morin van, police found one unfired twelve-gauge shotgun shell.

Florentino Garza also testified that Oscar Garza had told him that Mat Morin, Marc Morin, and Andy Cespedes had been involved in the murder.[2] Oscar Garza was a friend of Marc Morin and was also acquainted with Mat Morin and Andy Cespedes. This was the first time Florentino Garza had heard Andy Cespedes's name in connection with the murder. Florentino Garza testified that he obtained a warrant to search the Cespedes house and also a warrant for Andy Cespedes's arrest based on the information he received from Oscar Garza. Although Oscar Garza was called as a witness in this case, he testified that he had no recollection of the day of the murder, and did not remem-

ber making a statement to sheriff's investigators a few weeks after the murder.

After Andy Cespedes learned that his house had been searched he left home and became a fugitive. Yolanda Cespedes testified that Mat Morin phoned her house several times during the weeks that followed the murder, trying to contact her son. She also testified that Marc Morin and Mat Morin II (appellant's father) telephoned her house five or six times on the day after police searched her house, asking her to convey the message that they had arranged a lawyer for Andy. Andy Cespedes's brother, Jose Cespedes, testified that he saw his brother with Mat Morin in the Morins' grey van on the day of the murder. He also testified that they were carrying something wrapped in a towel that he thought was a gun.[3]

### Points on Appeal

Appellant's first two points of error are essentially the same. The first point argues that there was insufficient evidence to corroborate the testimony of the accomplice witness, and the second point argues that the trial court should have granted appellant's motion for directed verdict because there was insufficient corroboration. Since an argument that a motion for directed verdict should have been granted is, in essence, an argument that the evidence was insufficient to sustain a conviction, we will consider these points together. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex.Crim.App.1997); *Griffin v. State*, 936 S.W.2d 353, 356 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd).

■ A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect

---

1. The victim's mother, Eulogia Cantu, also testified that her son had told her he was going to see the appellant on the night he was killed.

2. This testimony from Florentino Garza provoked a hearsay objection from appellant's trial counsel, and is also ground for one of appellant's points of error, discussed below.

3. The testimony was as follows:
   ALEMAN: Okay. Did you notice anything different about them (Andy Cespedes and Mat Morin) from the time they walked in to the time they walked out?

   JOSE CESPEDES: Yeah. They walked out with something.
   ALEMAN: Walked out from where?
   CESPEDES: Walked out of my room—— our room——, outside with something, like a——
   ALEMAN: What do you mean "something?" Describe it.
   CESPEDES: Well, to me, you could say it was a gun because I had seen that gun in there before.
   ALEMAN: Okay.
   CESPEDES: And they just wrapped it in a towel.

the defendant with the offense committed. TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979). The corroboration is not sufficient if it merely shows the commission of the offense. *Id.* In order to determine whether the accomplice witness testimony is corroborated we eliminate all accomplice evidence from the record and determine whether the inculpatory facts and circumstances in evidence tend to connect the appellant to the offense. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim.App.1993).

The State contends that the following evidence corroborates the accomplice witness testimony in this case:

1) The victim's mother, Eulogia Cantu, testified that, as her son went out at 7:00 p.m. on the evening he was killed, he told her he was going to see appellant.

2) The accomplice's brother, Jose Cespedes, testified that he saw appellant with the accomplice on the day of the murder, and they were carrying what he thought was a gun wrapped in a towel.

3) Appellant's family telephoned Andy Cespedes's home stating that they would get a lawyer for Andy.

4) Robert Putty said he saw the Morins' van driving away from the area where the murder was committed at a high rate of speed at approximately 7:45 p.m.

5) The Morins' van had a dent and orange paint on the bumper that matched paint on a barrier pipe near the murder scene that had been bent in a manner consistent with a vehicle colliding with it.

6) Several spent twelve gauge shotgun shells were found at the murder scene, and one live twelve gauge shell was found in the Morins' van.

■ Appellant does not challenge the evidence regarding the victim's statement shortly before he was killed that he was going to visit appellant. Appellant only argues that this, by itself, would not be sufficient corroboration, since there is no other evidence that the victim was with appellant at the time he was killed. Regarding the second piece of evidence, appellant argues that the fact that Andy Cespedes and appellant were together on the day of the murder proves nothing,

since the two were friends who saw each other almost daily. We agree with that contention. *Cf. Leal v. State,* 782 S.W.2d 844, 852–53 (Tex.Crim.App.1989) (contact with family members not corroborating evidence). However, more incriminating is Jose Cespedes's statement that appellant and Andy Cespedes were carrying a gun wrapped in a towel on the day of the murder. Although Jose Cespedes's testimony on this point is less than adamant, it does provide some corroboration.

■ Regarding the offer of appellant's family to provide a lawyer for appellant's family, appellant urges us not to hold that offering to provide a lawyer for a friend who is under suspicion by the police is an incriminating act. The State argues that this was evidence of a guilty demeanor. *See Burks v. State,* 876 S.W.2d 877, 888 (Tex.Crim.App. 1994) (evidence of flight and guilty demeanor, coupled with other corroborating circumstances, may tend to connect defendant to crime). The State cites no authority for the proposition that seeking legal counsel, either for oneself or for a friend, can be an incriminating act. To hold that seeking legal counsel is incriminating evidence of a "guilty demeanor" would offend the spirit of the Sixth Amendment to the U.S. Constitution and could have a chilling effect on the exercise of Sixth Amendment rights. Without any authority indicating that we should consider these actions incriminating, we decline to do so.

Appellant argues that Putty's testimony that he saw the Morins' van near the murder scene shortly after the estimated time of the crime is not corroborating evidence, citing *Moron v. State,* 779 S.W.2d 399, 403 (Tex. Crim.App.1985). *Moron* held that evidence that a truck belonging to appellant's construction company was used in the commission of the crime was not probative of appellant's guilt. *Id.* However, in this case, the vehicle in question was a family vehicle, which ties the vehicle more directly to appellant. The match between the paint on the van's bumper and the paint on the bent barrier pipe at the murder scene provides strong evidence that the Morins' van was present at the murder scene. The presence

of the same caliber of ammunition in the vehicle as that which was used to commit the crime is also significant corroborating evidence.

Appellant argues that, since not only appellant but also his brother Marc and both his parents had access to the van, the involvement of the van in the crime does not tend to connect appellant. We do not agree. Appellant's parents had no connection to the victim, and no evidence casts any suspicion on them for the crime. Instead, the evidence suggests that appellant and his brother Marc were the only members of the Morin family involved.

█ We conclude that the evidence that a vehicle belonging to appellant's family was present at the scene of the murder, along with the victim's statement shortly before he was killed that he was going to see the appellant and the evidence that appellant was seen with the accomplice concealing a gun on the day of the murder, does tend to connect the appellant to the murder and provides sufficient corroboration. Appellant's first two points of error are overruled.

We next consider appellant's fourth point of error, which argues that the trial court should have excluded certain testimony on hearsay grounds. The testimony complained of came from the police investigator, Florentino Garza.

ALEMAN (prosecutor): Did you receive any information regarding any other—anyone else being involved directly?

FLORENTINO GARZA: Yes, sir.

ALEMAN: Okay. When do you recall—when, if you recall, did you receive that information?

GARZA: It was until (sic) maybe even September the 14th or the 15th.

ALEMAN: Okay. From whom did you receive any information about other people being involved?

GARZA: Oscar Garza.

ALEMAN: Okay.

VILLARREAL (defense attorney): Your Honor, at this time may we approach the bench?

The attorneys then conferred with the trial judge off the record. The record does not reveal any objections or rulings from the court at this time. When the conference was complete, this testimony followed:

ALEMAN: Did he (Oscar Garza) provide you any information that may have—did he provide to you any names or information of other individuals who may have been involved in the murder of Javier Cantu?

GARZA: Correct.

ALEMAN: Yes or no?

GARZA: Yes.

ALEMAN: Okay. What names, if any, did he give you?

VILLARREAL: Again, Your Honor, at this point I'm going to make my objection for the record as to hearsay.

THE COURT: Approach the bench.

Another off the record discussion was held. After that, the trial court announced that the objection had been sustained. However, the prosecutor soon returned to the same line of questioning:

ALEMAN: What information with regards to any names did you receive that you acted upon in continuing—in the continuation of your investigation?

GARZA: My log would say the names, sir.

ALEMAN: Yes.

GARZA: All the names that Oscar gave me.

ALEMAN: Yes.

GARZA: I believe that—

VILLARREAL: Your Honor, I would like to have a running objection(,) that way I won't interrupt anymore.

THE COURT: Your objection is noted as a running objection. It's overruled.

VILLARREAL: As to any hearsay.

THE COURT: Yes, sir.

ALEMAN: Specifically, in other words, the information that you received, without necessarily telling us what Oscar Garza said, but the names that you received that you followed up on.

GARZA: The information that I received was that Andy Cespedes, Marc Morin, and Mat Morin were involved.

ALEMAN: Now, with regards to the name Andy Cespedes, Officer Garza, had you heard that name before in the course of your investigation?

ALEMAN: No, sir.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R.CRIM. EVID. 801(d). Appellant contends that the State elicited "backdoor" hearsay consisting of Oscar Garza's out of court statement that the appellant was involved in the murder. The State implicitly acknowledges that the testimony above conveys Oscar Garza's out of court statement, but counters that the testimony was not being used to prove that appellant was involved in the murder, but rather to show only how investigator Garza came to suspect Andy Cespedes was a party to the murder.

We believe the testimony above was inadmissible hearsay. While the Court of Criminal Appeals has acknowledged in this context that "an arresting officer should not be put in the false position of seeming just to have happened upon the scene, he should be allowed some explanation of his presence and conduct," that court said in the same case that "the police officer should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports on grounds that she was entitled to tell the jury the information upon which she acted." *Schaffer v. State*, 777 S.W.2d 111, 114–15 (Tex.Crim.App. 1989).

■ Courts are to discriminate between cases where some hearsay is allowed to explain the officers actions from those. cases where such hearsay is inadmissible based on the degree to which the actions of the police officer have been challenged by the defendant. When an arresting officer's actions are not put into question before the jury, testimony that the officer acted upon "information received" should be sufficient. *Id.* at 115 n. 4; *see also Hill v. State*, 817 S.W.2d 816, 818 (Tex.App.—Eastland 1991, pet. ref'd) (backdoor hearsay explaining officer's suspicions not justified when probable cause and officer's actions not at issue). In this case, appellant never challenged the methods of investigator Garza. No objection was made that appellant was improperly arrested or that any search was conducted without probable cause. Therefore, the State was under no obligation to explain investigator Garza's actions, and the use of hearsay to explain his actions cannot be justified.

■ Even if appellant had made an issue of how Cespedes became a suspect, the method of examination employed by the State would still be unacceptable. If, as the State claims, it merely wished to allow investigator Garza to explain how he came to suspect Andy Cespedes, the State could have conducted its examination in a way that would have allowed investigator Garza to mention Oscar Garza's tip regarding Cespedes without any mention of appellant. The portion of investigator Garza's testimony that Oscar Garza named Mat Morin does not serve to explain how Andy Cespedes became a suspect; that portion of the testimony serves only as proof of the matter asserted, that Mat Morin was involved in the murder.

The State contends that it complied with *Schaffer* because the prosecutor limited the investigator's testimony by asking him to state only the names of those who had developed as suspects and not to repeat to the jury the specific details of his conversation with Oscar Garza. We cannot agree with this characterization. The prosecutor asked the investigator for the names supplied to him by Oscar Garza. This obviously was a "specific detail" of their conversation. *Schaffer* requires that the State use hearsay only to the extent required to rebut challenges to the officer's actions raised by the defendant, and absolutely prohibits the use of hearsay which goes beyond explaining the officer's actions, such as the reference to Oscar Garza's naming of Mat Morin did in this case. *Schaffer*, 777 S.W.2d at 115. We conclude that allowing this hearsay testimony over appellant's objection was error.

■ We next proceed to determine whether this error constitutes reversible error. The harmless error rule requires reversal unless the appellate court determines "beyond a reasonable doubt that the error

made no contribution to the conviction or to the punishment." Tex.R.App. P. 81(b)(2); *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim.App.1989). An appellate court should not focus on the propriety of the outcome of the trial but instead on the integrity of the process leading to the conviction and punishment. *Harris*, 790 S.W.2d at 587; *Perry v. State*, 933 S.W.2d 249, 254 (Tex.App.—Corpus Christi 1996, pet. ref'd). Consequently, an appellate court should consider the following six factors when conducting a harm analysis:

1. The source of the error;
2. The nature of the error;
3. Whether or to what extent it was emphasized by the State;
4. Its probable implications;
5. How much weight a juror would probably place upon the error; and,
6. Whether declaring the error harmless would encourage the State to repeat it with impunity.

*Id.*

■ The State was the source of the error in this case. The State elicited the hearsay from its own witness. The defense had not challenged the investigator's conduct, so there was no need for him to refer to hearsay to justify his actions. The State could have phrased its questions in a way that would have avoided any danger of hearsay. Therefore that factor weighs in favor of reversal.

The nature of the error in this case was that the jury was permitted to consider as evidence an impermissible hearsay statement that Oscar Garza, an acquaintance of the appellant, the accomplice witness, and the other alleged party to the crime, told a police investigator that those three were involved in the murder. This is the most egregious kind of hearsay—a direct accusation of murder from an out of court declarant whose reliability was based only on implications the jury may have drawn from the faith the police showed in him. Although appellant might have hoped to cross-examine Oscar Garza when he took the stand, Oscar insisted while testifying that he had no memory of his statement to police, so cross examination would have been futile. This hearsay statement spoke to the ultimate issue in the case—the corroborating evidence of appellant's involvement in the murder. We therefore conclude that the nature of this error weighs in favor of reversal.

The State did not refer to Oscar Garza's statement during the closing argument, nor did the State dwell on it when the statement came up in testimony. However, the State did try repeatedly to ensure that Oscar Garza's statement, naming not just Andy Cespedes but also the appellant, was heard by the jury. Since the State did not refer to this evidence in its closing statement nor dwell on its probative value when it was made, we conclude that this factor weighs in favor of holding the error harmless. However, the State's actions in straining to ensure that the damaging hearsay component was heard by the jury does provide some indication of emphasis, which diminishes the force with which this factor favors finding the error harmless.

We next consider the weight the jury probably placed upon this hearsay evidence. The jury was properly instructed that, in order to find sufficient corroborating evidence, they were required to eliminate the accomplice's testimony from consideration and then examine the remaining evidence to determine whether it independently tended to connect the appellant with the crime. The hearsay statement heard by the jury was that someone acquainted with the Morin brothers and Cespedes had told police that those three were responsible for the murder. The jury also heard that the State considered that information so reliable that, even though they had no other evidence implicating Cespedes, they sought warrants to arrest Cespedes and search his house based on Oscar Garza's tip. Therefore the "probable implications" of this error are that the jury may have considered this evidence significant, since the police response to the tip implies that the tip was trustworthy. As the jury followed the testimony, looking for evidence that would corroborate Cespedes's testimony, Oscar Garza's statement must have struck the jury as significant corroboration and deserving of significant weight in their

deliberations. While the jury did have other corroborating evidence before it, the other corroborating evidence was not so "overwhelming" that it "dissipate's the error's effect upon the jury's function in determining the facts so that it did not contribute to the verdict." *Harris,* 790 S.W.2d at 587. We conclude that these factors weighs in favor reversal.

Finally, considering this error to be harmless could only encourage the sort of semantic gymnastics employed by the prosecutor in this case to conceal the hearsay nature of evidence it wished to get before the jury. Frequently the State will be aware of hearsay evidence that would be helpful to the prosecution if the evidence could be presented to the jury. The Rules of Criminal Evidence are meant to ensure that convictions are based on reliable evidence and not on hearsay that does not meet any of the carefully crafted exceptions. To declare this error harmless would be to sanction the State's use of unreliable evidence to obtain a conviction, and is a situation that could be repeated often if the treat of reversal did not loom over such abuses. This factor also favors reversal.

In conclusion, the only factor favoring holding the error harmless was the degree to which the State emphasized the error. However, our consideration of even that factor must be tempered by the State's inexcusable insistence on getting the damaging hearsay before the jury. We are unable to find beyond a reasonable doubt that the admission of this hearsay statement made no contribution to the jury's finding of adequate corroboration and the subsequent conviction. Appellant's fourth point of error is sustained.

When we find reversible error in failing to exclude hearsay evidence, the proper disposition is to reverse and remand for a new trial. *Cofield v. State,* 857 S.W.2d 798, 805 (Tex.App.—Corpus Christi 1993), *aff'd,* 891 S.W.2d 952 (Tex.Crim.App.1994). Therefore, we need not consider appellant's argument that evidence of extraneous crimes was used in his trial without adequate notice, since even if appellant prevailed on this point of error his remedy would be no greater than the remand for a new trial that he is entitled to under his fourth point of error. Tex. R.App. P. 90(a).

The judgment of the trial court is REVERSED and we REMAND the case for a new trial.