# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 9, 2010

No. 06-41590

Lyle W. Cayce
Clerk

MATIAS MORIN,

Plaintiff-Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:05-CV-118

Before JOLLY, WIENER, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Petitioner-Appellant Matias Morin, III ("Morin") appeals from the district court's denial of his petition under 28 U.S.C. § 2254, challenging his second conviction by a jury for the 1993 murder of Javier Cantu. He contends that he received ineffective assistance of counsel because (1) his attorney labored under an actual conflict of interest during the representation; and (2) his attorney failed to object to (and in one instance caused the introduction of) evidence that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 06-41590

was inadmissible or prejudicial, or both.  Concluding that the errors alleged to have been committed by the state court do not rise to the demanding standard required by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), we affirm.

## I. FACTS & BACKGROUND

### A.    Facts

In August 1993, Javier Cantu was murdered in the proximity of an irrigation canal near Edinburgh, Texas.  He suffered several gunshot wounds to his head and his chest.  Petitioner-Appellant Morin, his younger brother Marc Morin ("Marc"), and another young man, Javier "Andy" Cespedes, were the only ones present when the shooting occurred.  Prior to the homicide, the four young men had been involved in the sale and distribution of various narcotics, with Cantu acting as the supplier for the other three.  For the sake of efficiency, we adopt the district court's summary of the evidence presented at the trial, which in turn relied on the summary of the evidence generated by Texas's Thirteenth Court of Appeals:

> The State's chief witness, Javier Andres "Andy" Cespedes, was an accomplice in the crime.  He testified that in August, 1993, he was with appellant, Marc Morin, and Javier Cantu.  Marc gave some cocaine to Cantu and asked him to sell it.  Cantu left with the cocaine but later returned it because he could not sell it.  Appellant, [sic] then took the cocaine to Houston and tried to sell it there.  However the buyers threatened to kill him when they discovered that the cocaine was "cut up," meaning that it was not strong enough.  Afterwards appellant blamed Cantu for nearly getting him killed and said that Cantu "had to go down."

> On August 26, 1993, appellant and Andy went to a store where appellant bought a box of shotgun shells.  After buying the shells they drove to Andy's house and loaded two shotguns and a 9

-2-

No. 06-41590

millimeter gun. Andy kept the guns in his bedroom. They wrapped towels around the guns and put the guns in the back of the van which appellant was driving. After picking up Marc the trio decided that appellant would call Cantu over the telephone and ask him to go to a location near a canal in the Edinburg, Texas, area. Appellant would take him to the canal where Marc and Andy would be waiting in the van. They decided that each person would shoot Cantu one time at the canal. After agreeing on the plan they returned to appellant's house. Appellant called Cantu and then told Marc and Andy that Cantu was "on his way" and "to take off to the canal" and wait there. When appellant and Cantu arrived at the canal Andy aimed a shotgun at Cantu's head. Andy testified that "Mat [appellant] is looking at me, so he takes two steps back and then he looks back at me and nods his head. That's when I pulled the trigger and he [Cantu] falls down." Andy shot Cantu three more times with the shotgun and six times with the 9 millimeter. Afterwards appellant, Marc, and Andy drove to the home of Isaac Fuentes. Appellant and Isaac took the two guns used in the murder out of the van and then washed the van.

Eulogia Cantu testified that on August 26, 1993, she and her son, Javier Cantu, were at home. She saw him using the telephone. After hanging up he told her that he was going to meet appellant. He left the house about 7:20 p.m.

Jose Cespedes, Andy's brother, testified that a couple of days before the murder he saw what looked like a machine gun underneath the bed in the bedroom where he and Andy slept. Around noon on the day of the murder Jose was home when Andy and appellant came to the house and went into the bedroom where the machine gun was located. They stayed in the bedroom for twenty minutes. When they came out Andy was carrying the machine gun which was wrapped in a towel. Jose saw them get into a van and leave.

Appellant testified that he had gone to Houston prior to Cantu's murder, but he denied that he had tried to sell any cocaine there. He testified that on the day of the murder he and Cantu went to the

No. 06-41590

canal because Cantu wanted to talk to Marc.[1] Appellant and Cantu arrived at the canal about 7:30 p.m. They got out of Cantu's car and walked to the van. While appellant stood near the van he heard an "explosion." He panicked and got into the van. He heard some more explosions or shots and then Andy threw a shotgun inside the van. He then saw Andy take a machine gun out of the van. He tried to take the gun away from Andy but Andy cocked it in his face. Appellant got into the van and closed the door. He heard another shot and then Andy got into the van. After the shooting Marc and Andy dropped off appellant at Isaac Fuentes' house. Appellant's testimony was that he did not nod his at Andy before Andy had shot Cantu. He denied saying that Cantu had to go down, and he denied having anything to do with the murder.

Isaac Fuentes testified that he went with appellant to Houston. He stated that he was with appellant during the entire trip and that appellant did not try to sell any cocaine there.

Eli Armenta, Andy's neighbor, testified that on the day of the murder no one was at Andy's home until Andy's mother arrived about 5:00 p.m. He never saw the Morin family van at Andy's home that day.

* * * *

Dr. Santos, [the medical examiner], testified on direct examination that Cantu was shot ten times. He had six distant-type gunshot wounds to the right side of the face. He received one shotgun wound to the front of the right ear. Dr. Santos said that although he was not a ballistics expert this wound was made from a range of between three to five feet. Cantu had three other shotgun wounds. He said that these wounds "were of a close range type" because he found wads in each of the perforations. He did not know

---

[1] A review of Morin's testimony at trial reveals that he denied seeing or communicating with either his brother Marc or Cespesdes on the day of the murder until shortly before Cantu came to pick Morin up. Morin also testified that Cantu called the Morin family home twice that day, looking for Marc.

No. 06-41590

the order in which the shots were fired, nor which were fired first.

On cross examination counsel questioned him about the shotgun wound to Cantu's head. His testimony was that generally speaking this wound was inflicted at a distance of three to five feet. Counsel also questioned him about the trajectory of the gunshot wounds to Cantu's face. Dr. Santos said that they were fired from Cantu's right side.[2]

## B.    Facts and Proceedings

Morin, Marc, and Cespedes were charged with Cantu's murder. Morin was indicted in September 1993, at which time Morin's father hired attorney Abel Toscano, Jr. to represent his son. A month later, Marc (who was sixteen at the time) was charged with the murder. In April 1994, Marc was certified for prosecution as an adult, and Toscano was retained to represent both Morin *and* Marc. In approximately September 1994, Toscano withdrew as Morin's counsel. That month, Cespedes pleaded guilty and received a 30-year sentence in exchange for his willingness to testify against Morin.

Morin was the only one of the three to be brought to trial. In 1995, a jury found him guilty and sentenced him to 60 years imprisonment, and imposed a $10,000 fine. After Morin's conviction and sentencing, Toscano represented Marc in a plea negotiation that resulted in Marc's pleading guilty to the Cantu murder, and giving a sworn oral statement to the authorities detailing his recollections of everything that happened at the scene of the crime and elsewhere on the day of the murder.

After Marc's guilty plea, however, the Texas's Thirteenth Court of Appeals

---

[2] *Morin v. State,* No.13-99-119-CR, 2000 WL 34251914, *1-3 (Tex. App.– Corpus Christi Aug. 17, 2000) (unpub'd).

No. 06-41590

reversed Morin's conviction and remanded for a new trial.[3]  Morin retained Toscano (who previously had only represented Marc in his plea negotiation) as counsel for Morin's second trial.[4]  The State filed a motion to disqualify Toscano, alleging a conflict of interest arising from Toscano's previous representation of Marc.  Morin's opposition to the State's motion included affidavits from both Morin and Marc, waiving any potential conflict.  Morin's affidavit stated explicitly that he had read the State's motion to disqualify Toscano, that he was familiar with the contents of Marc's sworn statement given to the State in connection with Marc's guilty plea, and that he understood he had the right to retain other counsel.  The trial court denied the State's motion without a hearing.

In November 1998, a jury convicted Morin a second time, and imposed a 62-year prison sentence and a $10,000 fine.[5]  Morin appealed, and the Texas Thirteenth Court of Appeals affirmed his conviction.[6]  In April 2001, the Texas Court of Criminal Appeals refused discretionary review.

Morin filed his state habeas petition in July 2002, which was denied

---

[3]  *Morin v. Texas,* 960 S.W. 2d 132, 138 (Texas Crim. App. 1997) (holding that erroneous admission of hearsay testimony warranted reversal).

[4]  Morin's father, who had originally retained Toscano, died prior to Morin's second trial.  Morin's mother hired Toscano to probate the father's estate and handle the family finances.  Toscano also borrowed $25,000 from the estate with Mrs. Morin's permission.  At the time he was retained to represent Morin at his re-trial, he still owed over $16,000 on the loan from the Morin estate.

[5]  Although the jury imposed a 62-year sentence, this was reduced to 60 years on motion of the defendant.  On direct appeal, the State urged that this reduction was in error.  The Thirteenth Court of Appeals agreed with the State, and re-instated the jury's original 62-year sentence.  *Morin,* 2000 WL 34251914, at *3.

[6]  *Morin,* 2000 WL 34251914, at *3.

No. 06-41590

without an evidentiary hearing and without findings of fact or conclusions of law. The Texas Court of Criminal Appeals denied relief without written order.[7] Morin filed his federal habeas petition in April 2005, and, in September 2006, the district court denied relief at the recommendation of the magistrate judge. The district court granted a COA to address two issues,[8] only one of which Morin has pursued on appeal: whether the district court erred in its determination that the state court was not objectively unreasonable in concluding that Morin's trial counsel was not ineffective.

## II. ANALYSIS

Morin premises his ineffective assistance of counsel claim ("IAC") on two theories: (1) that at his second trial, Toscano labored under an actual conflict of interest; (2) that Toscano failed to object to (and, in some instances, caused the introduction of) evidence that was inadmissible or prejudicial or both, over the course of a nearly month-long trial. Satisfied that the state court's denial of Morin's IAC claim was not objectively unreasonable under either theory, we affirm.

### A.    Standard of Review

As Morin's IAC claims were filed in the district court after April 24, 1996, they are subject to the provisions of the Antiterrorism and Effective Death

---

[7] *Ex parte Morin,* No. WR-58,689-01 (Tex. Crim. App. March 30, 2005).

[8] As reflected by the parties' briefs, and as confirmed by Morin's counsel at oral argument, Morin abandoned the second issue certified for appeal, namely, "whether the district court erred in concluding that the state court decision that motion for new trial counsel was effective was not objectively unreasonable." That issue is therefore not before this court.

No. 06-41590

Penalty Act of 1996 ("AEDPA").[9] Under the AEDPA, a petitioner is not entitled to relief unless he can show that the state court decision denying relief was "contrary to" or "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States."[10] The AEDPA also requires us "to presume state-court findings of fact to be correct 'unless the petitioner rebuts that presumption by clear and convincing evidence.'"[11] We review the district court's interpretation of the AEDPA *de novo,* and review its findings of fact for clear error.[12] The AEDPA's deferential standard of review only applies to the state court's adjudication of a petitioner's claim on the merits,[13] a condition satisfied here.

IAC claims are mixed questions of fact and law, and consequently are "reviewed under the 'contrary to' and 'unreasonable application' prong of 28

---

[9]   28 U.S.C. § 2254(d)(1)-(2).

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[10]   28 U.S.C. § 2254(d); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002) *cert. denied* 538 U.S. 969 (2003).

[11]   *Wooten v. Thaler,* No. 07-70044, --- F.3d ----, 2010 WL 699515 at *2 (5th Cir. Mar. 2, 2010) (citing *Valdez v. Cockrell,* 274 F.3d 941, 947 (5th Cir. 2001) *cert. denied* 537 U.S. 883 (2003) (citations omitted)).

[12]   *Thompson v. Cain,* 161 F.3d 802, 805 (5th Cir.1998).

[13]   28 U.S.C. § 2254(d).

U.S.C. § 2254(d)."[14]  A state court's decision is "contrary to" clearly established Supreme Court precedent when it "applies a rule that contradicts the governing law set forth in [the Court's] cases," or reaches an opposite conclusion from a Supreme Court case upon facts that are "materially indistinguishable."[15]  In the alternative, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing law but unreasonably applies it to the facts of a particular case.[16]  A state court's application of the law must be objectively, not subjectively, unreasonable.[17]  As the Supreme Court has explained, "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law," in the sense that it is *not* "simply because [the reviewing] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."[18]

When, as here, the state court denies relief without issuing a written order or otherwise specifying its reasons, our AEDPA inquiry is not affected.  Instead we "(1) assume[] that the state court applied the proper clearly established federal law; and (2) then determine[] whether its decision was contrary to or an

---

[14]  *Moore v. Cockrell,* 313 F.3d 880, 881 (5th Cir. 2002).

[15] *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000) (O'Connor J., concurring)(concurrence commanded a majority for the proposition cited).

[16]  *Id.* at 407-09.

[17]  *Id.*

[18]  *Id. Accord, Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher standard.").

No. 06-41590

objectively unreasonable application of that law."[19]

## B.    Ineffective assistance of counsel

### 1.    Morin's *Sullivan* claim

"Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of interest."[20] To prevail on an IAC claim, the petitioner must satisfy the familiar, two-prong *Strickland* test by establishing that (1) counsel's performance fell below objective, professional standards of reasonableness, and (2) the deficient performance prejudiced the defense.[21] Thus, to succeed under *Strickland*, a petitioner must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."[22]

A petitioner alleging a Sixth Amendment violation on the basis of counsel's purported conflict of interest, however, must bear a slightly different burden. In *Cuyler v. Sullivan,*[23] the Supreme Court considered whether "the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel," and noted with approval its prior holding

---

[19] *Jordan v. Dretke,* 416 F.3d 363, 368 (5th Cir. 2005) (internal citations and marks omitted).

[20] *United States v. Vaquero,* 997 F.2d 78, 89 (5th Cir. 1993) *cert. denied Taylor v. United States*, 510 U.S. 1016 (1993) (citing *Wood v. Georgia*, 450 U.S. 261, 271 (1981)); *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980).

[21] *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984).

[22] *Mickens v. Taylor,* 535 U.S. 162, 166 (2002) (framing the issues before the Court as "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known.") (Stevens, Souter, Breyer, Ginsburg, *dissenting*).

[23] 446 U.S. 335, 345 (1980).

No. 06-41590

that there are circumstances under which an attorney may represent multiple criminal defendants in connection with the same criminal transaction without offending the Sixth Amendment.[24] The Court held that if the defendant did not object to the multiple representation at trial, such an arrangement can only give rise to a cognizable IAC claim if it "actually affected the adequacy of [the petitioner's] representation."[25] In a later gloss on the *Sullivan* standard, the Court reiterated that "'[a]n actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."[26] If the defendant establishes the existence of such a conflict, though, the prejudice prong of *Strickland* is relaxed such that the petitioner need not show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."[27]

The crux of the inquiry, therefore, is whether "trial counsel had a conflict of interest that hampered the representation"[28] in the sense that "counsel

---

[24] *Sullivan,* 446 U.S. at 345 (noting with approval its assessment in a prior case that "'[a] common defense . . . gives strength against a common attack.'") citing *Holloway v. Arkansas*, 435 U.S. 475, 482-483 (1978)).

[25] *Sullivan,* 446 U.S. at 349.

[26] *Mickens,* 535 U.S. at 172, n. 5 (also noting that "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect.").

[27] *Mickens*, 535 U.S. at 166; *Perillo v. Johnson,* 205 F.3d 775, 781 (5th Cir. 2000) ("Assuming the defendant establishes an actual conflict that adversely affected counsel's performance, prejudice is presumed without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial.").

[28] *Mickens,* 535 U.S. at 179. (Kennedy, J., concurring).

No. 06-41590

*actively represented* conflicting interests."[29]  "[A] conflict will exist only when counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client."[30]  Such a conflict does not arise, however, when the alleged conflict is merely "hypothetical," "speculative[,] or potential."[31] Relevant factors may include (1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter; (3) how close are the multiple representations in time; and (4) whether the prior representation has terminated.[32]  As we have noted, *Sullivan's* 'actual conflict' and 'adverse effect' elements are "rather vague," so IAC claims predicated on such conflicts are "tightly bound to the particular facts."[33]

The state habeas court did not unreasonably apply the *Sullivan* standard to Morin's petition.  Morin urges that Toscano's prior representation of Marc adversely affected Toscano's representation of Morin because concern for Marc

---

[29]  *Beets v. Scott,* 65 F3d 1258, 1266 (5th Cir. 1995) (en banc) (citing *Sullivan v. Cuyler,* 446 U.S. 335 (1980)) (emphasis added).

[30]  *Culverhouse,* 507 F.3d at 892-93.

[31]   *United States v. Garcia-Jasso,* 472 F.3d 239, 243 (5th Cir. 2006) (citing *Beets v. Scott,* 65 F.3d 1258, 1277) (5th Cir. 1995) (en banc) and *United States v. Infante*, 404 F.3d 376, 391 (5th Cir.2005)).

[32]  *U.S. v. Burns,* 526 F.3d 852, 856 (5th Cir. 2008).

[33]  *Perillo*, 205 F.3d at 782 (citing *Maiden v. Bunnell*, 35 F.3d 477, 481 (9th Cir. 1994)).

led Toscano to refrain from calling him to testify at Morin's trial.[34]  Morin theorizes that his brother's sworn statement to prosecutors two years earlier, given in connection with his own plea agreement, would have substantially corroborated Morin's testimony that there was no plan to kill Cantu, as well as Morin's account of the shooting.  Crucially, however, Morin does not contend that Marc would have testified in any way that would have contradicted his earlier sworn statement; rather, it appears to be Morin's theory that because Marc's testimony would have been an unalloyed benefit, the only reason Toscano would not have called Marc was out of concern that prosecutors might thereafter retaliate against Marc by opposing some future parole application.  Morin points to the fact that Toscano arranged for a bench warrant to be issued to bring Marc from prison to a nearby county jail, but never called Marc to testify. Morin also offers his own affidavit, executed in support of his state habeas petition, in which he stated that he "was told" that Toscano did not call Marc to testify out of concern for prosecutorial retaliation against Marc.   Morin does not, however, identify the source of this information.

Morin's assertion that Marc's version of events would have corroborated his own and that Marc would have done nothing more than testify consistently with his sworn statement of years earlier belies his argument that Toscano actively represented conflicting interests in violation of *Sullivan* and its progeny. As the federal district court properly noted, (1) Morin's questionnaire to Toscano in connection with Morin's state habeas claim did not ask why Toscano failed to

---

[34] The state contends that even if there were a conflict of interest Morin and Marc executed  affidavits waiving any such conflict and opposed the state's motion to disqualify Toscano.  The state urges that Morin should therefore be estopped from asserting a *Sullivan* claim.  Because we hold that it was not unreasonable for the state habeas court to conclude that there was no conclude, we do not reach the State's waiver/estoppel claim.

call Marc; (2) the State never called Marc as a witness for the prosecution; and (3) Morin identifies no confidential information that Toscano had obtained from Marc that would have aided Morin. Our review of Marc's prior sworn statement to law enforcement leads us to agree with the district court's assessment that Morin overstates the degree to which Marc's testimony would have bolstered, if not actually undermined, his brother's version of events.[35] For these reasons, we cannot conclude that the state habeas court's rejection of Morin's *Sullivan* claim was unreasonable.[36]

## 2.    Morin's *Strickland* claim

Morin's second IAC theory is grounded on incidences of Toscano's failure to object to—and, in one instance, his introduction of—damaging evidence during the course of Morin's month-long trial. These include Toscano's failure to object to (1) inadmissible testimony that Marc had pleaded guilty to committing the murder; (2) a tape-recorded conversation between Toscano and Cespedes that is allegedly damaging to Morin and to the jury's perception of Toscano's professional credibility; (3) testimony that Toscano and another

---

[35] Contrary to Morin's assertions, Marc's statement makes clear that he was not with his brother when his brother and Cespedes were gathering firearms and ammunition for the assault on Cantu, and that Marc could remember very little about the actual events at the scene of the murder. In fact, Marc's statement reveals that Cantu had recently threatened Marc and that Marc had told Morin about the threats. It also reveals that Marc and Morin had decided they no longer wanted to have anything to do with Cantu and were going to communicate as much to Cantu at the canal that night.

[36] Although a petitioner, whose attorney-conflict theory of ineffective assistance fails, may try to obtain relief under the more demanding *Strickland* standard, Morin has not done so here. *Bostick v. Quarterman,* 580 F.3d 303, 306 n.2 (5th Cir. 2009). ("In the absence of [*Sullivan*]'s actual conflict exception, a defendant claiming that his attorney had a conflict of interest must show a reasonable probability that the conflict prejudiced the defense.") (internal marks and citations omitted).

No. 06-41590

attorney visited Cespedes in prison and told him to "keep quiet"; and (4) Toscano's introduction of the fact that Morin invoked his right to remain silent after he surrendered to the police. Because it was not objectively unreasonable for the state habeas court to hold that these errors did not prejudice Morin's defense, we affirm the district court.

Under *Strickland*, a petitioner must establish that counsel's performance fell below objective, professional standards of reasonableness, and that the deficient performance prejudiced the defense.[37] If a defendant is unable to meet either prong of the test, a court is not compelled to consider the other prong.[38] For determining deficiency, counsel's performance is compared to "reasonableness under prevailing professional norms,"[39] such as "[p]revailing norms of practice as reflected in American Bar Association Standards and the like."[40] Counsel is entitled to a "strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance," and "every effort [must] be made to eliminate the distorting effect of hindsight."[41] In assessing whether a challenged action was strategic, the reviewing court must remain mindful of the weight of the evidence supporting the verdict.[42] To establish

---

[37] *Strickland*, 466 U.S. at 687-88.

[38] *Id.* at 697 (stating that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

[39] *Wiggins v. Smith,* 539 U.S. 510, 521 (2003).

[40] *Strickland,* 466 U.S. at 688.

[41] *Strickland,* 466 U.S. at 689.

[42] *Moore v. Johnson,* 194 F.3d 586, 591-92 (5th Cir. 1999).

## No. 06-41590

prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different."[43] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[44] Importantly, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."[45]

### (A) Failure to object to testimony that Marc had pleaded guilty to committing the murder

Three times during the month-long trial, testimony was offered, without objection from Toscano, that Marc had been convicted of the murder in question. As the district court properly determined, under Texas rules, evidence that "a non-testifying person, who has either been jointly or separately indicted for the same offense as the accused, has been convicted or acquitted is inadmissible."[46] Toscano's response to Morin's habeas questionnaire indicated that he thought the jury's knowledge of Marc's lenient sentence would be helpful at the sentencing stage. Although likely ill-advised, failure to object to inadmissible evidence is not *per se* prejudicial,[47] and it is difficult to conclude on this record

---

[43] *Stickland,* 466 U.S. at 694.

[44] *Id.* at 687.

[45] *Cotton v. Cockrell,* 343 F.3d 746, 752-53 (5th Cir. 2003)(internal citations omitted).

[46] *Miller v. State,* 741 S.W.2d 382, 389 (Tex. Crim. App. 1987)(en banc).

[47] *Jordan v. Wilkinson,* 244 Fed. App'x. 581, 582 (5th Cir. 2007) (holding failure to object to inadmissible hearsay evidence does not rise to *Strickland* violation without demonstration of prejudice).

that *had* the evidence of Marc's conviction been excluded the verdict would have been called into question.[48]  Morin had admitted that he was present with Cespedes and Marc at the scene of the crime, and the jury knew that Cespedes had pleaded guilty to the murder.  Moreover, there was substantial evidence of conspiracy: Cespedes's account of Morin's involvement in the preparation and transport of the weapons was corroborated by Cespedes's brother, who saw them carrying the guns in and out of Cespedes's home on the day of the murder; the victim's mother testified that Morin had telephoned Cantu just before he left that evening, and that Cantu had told her he was meeting with Morin.  On these facts, we conclude that it was not an error cognizable under the AEDPA for the state habeas court to conclude that Morin was not prejudiced by Toscano's failure to object to this inadmissible evidence.

*(B) Failure to object to a tape-recorded interview between Toscano and Cespedes that allegedly damaged both Morin's defense and the jury's perception of Toscano's professional credibility*

Before Toscano withdrew from representing Morin in his first trial, he visited Cespedes while Cespedes was in police custody but was not yet represented by counsel, and tape-recorded their conversation.  Toscano apparently did this to find out for the Morins what Cespedes had related to the police.  In that tape recorded conversation, Cantu admitted that he was under the influence of Rohypnol and alcohol on the night of the homicide, and that he barely remembered anything that happened.  He also acknowledged that he told the police that Morin had planned to kill Cantu at the canal.  Although Toscano

---

[48] *Paredes v. Quarterman,* 574 F.3d 281, 286 (5th Cir. 2009) (citing *Strickland,* 466 U.S. at 668).

## No. 06-41590

promised to do so, he never gave Cespedes a copy of the tape, and when Toscano finally gave prosecutors a copy prior to Morin's re-trial, twenty minutes were missing. Toscano then failed to object to the introduction of the tape at trial. After the State introduced the tape, Cespedes testified that he believed Toscano had made the tape to use against Cespedes when he testified, and the prosecutor drew attention to Toscano's shady behavior in his closing remarks. In his response to Morin's state habeas interrogatories, Toscano stated, and the record confirms, that Toscano thought the statement would help undermine Cespedes's credibility because on it he admitted that he was under the influence of drugs and could not remember what had happened. A centerpiece of Morin's defense was that Cespedes had offered multiple versions of the events of that night, so his account at trial could not be trusted.

There can be no prejudice when damaging evidence that should not have been admitted is merely cumulative of evidence that was properly admitted.[49] In the tape recording, Cespedes told Toscano that he, Cespedes, had told the police that Morin had planned the murder. The tape recorded statements, however, replicate statements made by Cespedes to the police that were contained in a written report already in the record. The written report contained the damning assertions that the three young men had agreed to kill Cantu and that Morin planned the murder. Thus, any prejudicial effect of Cespedes's statement on the tape recording is significantly diminished.

As for Morin's assertion that the tape recording made Toscano look deceptive and unethical, damaging his credibility with the jury, Morin does not

---

[49] *King v. Cockrell*, 33 Fed. App'x. 703, at *4 (5th Cir. 2002) (holding that "there is no prejudice when testimony is duplicative of other testimony admitted at trial.")

identify which, if any, rule of professional ethics Toscano allegedly violated.[50] He simply argues that Toscano's dealings with Cespedes would have appeared shady to the jury, thereby damaging Toscano's credibility.  Even assuming Toscano *did* violate some ethical standard by obtaining information from Cespedes and informing Cespedes of his right to remain silent, counsel's violations of professional ethics are not *per se* prejudicial under *Strickland*.[51] On the record of this nearly month-long trial, including over three days of testimony from Cespedes alone, whose credibility the tape recording was meant to undermine, Morin has not shown, and we cannot conclude, that the exclusion of the tape-recorded conversation between Cespedes and Toscano would have affected the outcome of the trial.[52]

## *(C) Failure to object to testimony that Toscano and another attorney told Cespedes to "keep quiet"*

On the Toscano-Cespedes interview tape, Toscano advised Cespedes that he had the right not to speak to the police, and advised him not to do so. Cespedes also testified at trial that another, unnamed attorney—not Toscano, but one apparently claiming to represent Morin—visited him and told him he should "stay quiet."  Morin urges that this testimony implied to the jury that

---

[50] Under Texas's Disciplinary Rule of Professional Conduct 4.03, attorneys dealing with unrepresented individuals have a duty not to "state or imply that the attorney is disinterested," and the only advice they should give is that the unrepresented person obtain counsel.

[51] *Beets*, 65 F.3d at 1272; *accord, U.S. v. Nickerson*, 556 F.3d 1014, 1018 (9th Cir. 2009) (collecting cases from five circuits).

[52] *Smith v. Dretke,* 417 F.3d 438, 443 (5th Cir. 2005) (holding that "reasonable probability standard of *Strickland* prejudice involves weighing the error flowing from the attorney's deficient performance against the totality of the evidence).

Morin was "corruptly" seeking to persuade a witness not to testify through his attorney, Toscano. In his responses to Morin's state habeas interrogatories, Toscano stated that he did not believe that he had standing to object.

Even though we might view Toscano's response as incorrect, we cannot go so far as to conclude that introduction of this evidence resulted in *Strickland* prejudice. Even assuming that the failure to object constituted deficient performance, Toscano's statements to Cespedes were brief and ambiguous at best. Our review of the record does not lead us to conclude, as Morin urges, that the jury necessarily would have interpreted Toscano's words as an attempt to improperly silence or influence a witness. Moreover, Toscano did successfully object to the prosecutor's direct examination about why Cespedes thought that the visiting attorneys were advising him to "stay quiet." Although this is arguably a closer call, under the deferential standard of review mandated by the AEDPA, we cannot conclude that the state habeas court's rejection of Morin's IAC claim on this ground was contrary to or an unreasonable application of clearly established federal law.

### (D) Toscano's introduction of the fact that Morin invoked his right to remain silent after he surrendered to the police

At trial, Toscano elicited from Morin that he had turned himself in to the police voluntarily, but had remained silent on the advice of his father. In his response to Morin's state habeas interrogatories, Toscano explained that he wanted to bolster Morin's credibility with the jury by informing them that Morin had voluntarily turned himself in and had only remained silent on the advice of his father, an attorney. Review of the trial transcript reveals, however, that at the time, Toscano failed to elicit the fact that Morin's father was an attorney,

No. 06-41590

although this fact was introduced several times over the course of the trial.

Although it is well-settled law that the State may not draw attention to a defendant's post-arrest silence,[53] as the district court correctly noted, "a criminal defendant may, by his conduct, make otherwise constitutionally inadmissible evidence admissible for certain purposes," such as " for the purpose of rebutting the impression which [the defendant] attempted to create: that he cooperated fully with the law enforcement authorities."[54] Morin cites no authority—and we have found none—to support the proposition that it is impermissible for defense counsel to draw attention to a defendant's post-arrest silence when it is done pursuant to the defense strategy.[55] We therefore conclude that the state court's determination was not contrary to or an unreasonable application of federal law as established by the Supreme Court.

## III.  CONCLUSION

For the foregoing reasons, the district court's denial of habeas corpus relief is AFFIRMED.

---

[53] *Doyle v. Ohio,* 426 U.S. 610 (1976).

[54] *United States v. Fairchild,* 505 F.2d 1378, 1383 (5th Cir. 1975) (citing *Harris v. New York,* 401 U.S. 222 (1971)); *accord U.S. v. Martinez-Larraga*, 517 F.3d 258, 266-67 (5th Cir. 2008).

[55] As the district court properly noted and this court's review of both the trial transcript and Toscano's interrogatory responses confirm, Toscano sought to portray Morin as an accidental bystander to the murder who was taken by surprise by his own brother's involvement in the crime, and simply followed the advice of his attorney father in his dealings with law enforcement.